## Case No. 8,263.

### The LEOPARD.

[2 Lowell, 238.] [1]

District Court, D. Massachusetts. April Term, 1873.

COLLISION—FAILURE TO SHOW LIGHT—OTHERWISE SEEN—MISTAKE OF POSITION.

A steamer and a schooner were approaching each other in the night-time, and the schooner neglected to show a torch, as required by St. 28th Feb., 1871 (16 Stat. 459); but the crew of the steamer saw the schooner at least as early as the torch ought to have been shown; and the collision appeared to have arisen from a mistake of the position of the schooner in the channel, and not from a failure to see the schooner. *Held*, the fault of the schooner did not contribute to the collision.

[Cited in Perkins v. The Hercules, 1 Fed. 928; Farwell v. The J. H. Starin, 2 Fed. 110; Brainard v. The Narragansett, 3 Fed. 256; The Isaac Bell, 9 Fed. 848; The City of Lynn, 11 Fed. 341; The Excelsior, 12 Fed. 203; The Lizzie Henderson, 20 Fed. 528; The Pennland, 23 Fed. 556; The Oregon, 27 Fed. 757; The Ogemaw, 32 Fed. 925.]

Libel by the owners of the schooner Brutus against the steamer Leopard for damages, propounded that the schooner, loaded with sand, was coming up Fort Point channel, in the harbor of Boston, at eleven o'clock at night, on the second day of September, 1872, heading about south-westerly, with a light north-westerly wind, not enough to give her steerage way, when she was run into and instantly sunk by the steamer. The answer of the master, who was the claimant of the steamer, set up that she was coming down the harbor in order to proceed to sea, and was making only about three knots an hour; that the master was at the wheel, and the mate on the lookout, and both lights of the schooner were seen about one-eighth of a mile distant; that the schooner presently starboarded, and showed her green light, upon which the steamer's head was turned a little to port, in order to pass between the schooner and the town; that the schooner then began to swing across the steamer's course, showing first both lights, and then only the red light, upon which the engine was reversed as quickly as possible, and they hailed the schooner, but to no purpose. The evidence tended to show that the schooner was a small vessel loaded with sand, which was to be delivered at South Boston; that she intended to come to anchor below the bridge of the Hartford & Erie Railroad Company. On rounding into this channel, the schooner had taken in her mainsail and jib, and dropped the peak of her foresail. Her witnesses testified that her helm was kept at port all the time after she came into the channel, so that she was edging in towards the wharves; but that the wind died away, and she was drifting up with the tide when the collision happened, it being then flood-tide, within about an hour of high water. They hailed the steamer to port her helm; but heard nothing from her, and saw no change in her course or in her speed. The witnesses for the defence insisted that there was a four or five knot breeze; that the schooner changed her course; and that the steamer reversed her engine, as alleged in the answer. It was proved that the schooner's running lights were set, and burning, but that she showed no torch.

I. T. Drew, for libellants.

J. C. Dodge, for claimant.

LOWELL, District Judge. The case turns on the conduct of the schooner; because the night was fine, both vessels were easily to be seen, and were seen. The steamer was bound to avoid the schooner, and cannot excuse her failure to avoid her, except by showing some fault of omission or commission on the schooner's part, which either misled the steamer, or frustrated her manoeuvres, or prevented the schooner being seen soon enough. The charges are, that the schooner changed her course, and that she showed no torch. The former is denied; the latter is admitted, but it is denied that any ill consequences resulted from the neglect.

I cannot reconcile the evidence, nor account for all the differences; but my best judgment is, that the schooner did not make the changes which the master and mate of the steamer say she made. The conclusion that no starboarding took place on board the schooner rests on the positive evidence of her crew, on the statement of two disinterested witnesses looking on from another schooner, and on the very great improbability that a vessel going up this channel with a fair wind should take such a foolish course, without any motive. This point being found for the schooner, very much weakens the case against her; because the whole foundation is taken from under the answer, which makes the schooner's starboarding the reason for a like order on the part of the steamer. How the officers could have made such a mistake, I know not; but the fact detracts very much from the value of their succeeding observations of supposed changes of the lights. As they are the only persons who saw any change, I should feel unwilling to take it as proved on their testimony.

It is argued that the crew of the libellants' vessel virtually admit a change of course, when they say either that they put the helm to port, or that they kept it there at and after the time the steamer's lights were seen, unless we adopt their further statement, that they had no steerage-way. I am rather inclined to think the preponderance of the evidence makes out that the schooner had not steerage-way during the last few minutes before the collision; though I agree that the master must have thought he had wind enough to reach his anchorage ground when he took in most of his sails; but it had, per-

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

haps, died away. Supposing it even a four-knot breeze, I don't know how fast this schooner would work under two-thirds of her foresail, but I suppose she would have not much more than steerage-way. That precise question is not a vital one, in my judgment; because I do not consider that the schooner did change her course in any such way, or to any such extent, as to cause or contribute to this collision. If she kept her helm ported, which I understand she did, I see no reason to believe that this caused any change of course of the least consequence, if it caused any at all, on her part. I do not know that the rule of the road requires a sailing-vessel always to steady herself in the exact direction she is in when she sees a steamer approaching; that is to say, to put her helm amidships at once, and keep it there, if it is at the port or starboard. If she was going very slowly towards the right of the channel, and continued to go, so far as she went at all, in the same direction, I doubt very much whether this would be a change of course in the sense of the law,—even though it were true, as I think it is not, that she had in that way crossed over some considerable part of the channel from the time she was first discovered. I doubt whether the law means to draw any distinctions so fine as to prohibit a vessel that is crossing a channel to continue to cross it when a steamer is discovered. However, I do not believe that any such thing took place, or that the schooner's continuing to keep her head somewhat to the right had any thing to do with the collision. The great fault of conduct was in the steamer's putting her wheel to starboard; and there was no time, in my opinion, after this was done, when any thing on the part of the schooner could have changed the result.

The schooner did not comply with the act of 28th February, 1871, § 70 (16 Stat. 459), requiring every sailing-vessel, on the approach of a steamer during the night-time, to show a lighted torch upon that point or quarter to which such steamer shall be approaching; and the burden is upon the libellants to show that the neglect neither caused, nor contributed to cause, the unfortunate issue. This burden I consider the libellants to have sustained. The master and mate of the steamer appear to have seen the schooner early enough to have avoided her, and as soon as there was any obligation to show a torch; and the mistake which they made of supposing her to be on the easterly side of the channel does not seem to me to have arisen at all from any imperfect view of the schooner, but from a misconception of the situation and character of the channel itself. I suppose the new regulation in the act of 1871 was intended to give an additional warning to steamers, in case of need, and one the use or neglect of which could not well be disputed; so that if the red and green lights were not lighted, or were dim, or were overlooked, there should be still another means of calling attention to the sailing-vessel. But when it is found that the vessel was in fact seen, and her side-lights noted, though mistakenly, and even her foresail visible, as the master of the steamer says it was, I do not see that the torch would have added any thing to the knowledge which, fortunately for the libellants, the steamer's people already had of the position of the schooner. I shall not, therefore, divide the damage; for I find the first and only efficient mistake was committed by the steamer.

On the question of damages, nearly all the evidence comes from the libellants. They estimate their losses in their libel at $2,000 for the vessel, $85 for the cargo, and for clothing, &c., $300. The testimony goes to confirm these valuations, excepting that perhaps some allowance ought to be made for wear and tear of the schooner. She was very old, and had cost, within a year or so, $1,200; and repairs had been put upon her, which, if they were all supposed to add to her value to the full amount, would bring her cost above $2,000. But I suppose a part of these must be set down to current expenses necessary to keep the vessel going from year to year. Making some allowance for this, and, on the other side, giving something for delay of payment, I assess the damages at $2,140, of which $250 is for clothes and other effects of the master and crew. Decree for libellants for $2,140 and costs.