## THE FAVORITE.

*(District Court. N. D. Illinois.* December 12, 1881.)

1. STEAMER WITH A TOW—SAILING RULES 20 AND 21.

Where there is ample sea-room to make every maneuver necessary to insure safety, a steamer with a tow is bound by sailing rules 20 and 21 of section 4233 of the Revised Statues—which require a steam-vessel (1) to keep out of the way of a sail-vessel, when the two vessels are proceeding in such directions as to involve risk of collision; (2) when approaching another vessel so as to involve risk of collision—to slacken her speed, or, if necessary, stop and reverse.

In Admiralty.

*Schuyler & Kremer,* for libellants.

*Richberg & Kniep* and *McCoy & Pratt,* for respondent.

BLODGETT, D. J. This is a libel by the owners of the schooner Grace A. Channon, for damages by a collision between the schooner and the steam-propeller Favorite, on the waters of Lake Michigan, on the night of August 2, 1877, whereby the schooner and her cargo became a total loss. It is claimed by libellants that the collision occurred by reason of the negligence of those in charge of the steamer in not keeping out of the way of the schooner, while the respondents, the Kirby-Carpenter Company, owners of the steamer, insist by their answer and proof that the collision was so far contributed to, if not caused, by the negligence of those in charge of the schooner in not keeping her on her course, as to relieve the steamer from liability; and also that the steamer, being encumbered with tows, is not governed by rules 20 and 21 of section 4233 of the Revised Statutes of the United States.

The undisputed facts material to the issue are that on the night of the collision, the schooner, in pursuing a voyage from Buffalo to Chicago with a cargo of coal, was between Milwaukee and Racine, along the west coast of Lake Michigan, about nine miles from land, and the steamer was bound from Chicago to Menominee, light, with three barges in tow, also light. The wind was from west to west by north; the night clear. The schooner and steamer each had their proper lights burning, the steamer having two bright white lights burning at her mast-head, to indicate that she was towing other vessels.

The sailing rules involved in this controversy are:

Rule 4. "Steam-vessels, when towing other vessels, shall carry two bright white mast-head lights vertically, in addition to their side lights, so as to distinguish them from other vessels," etc.

Rule 20. "If two vessels, one of which is a sail-vessel and the other a steam-vessel, are proceeding in such directions as to involve risk of collision, the steam-vessel shall keep out of the way of the sail-vessel."

Rule 21. "Every steam-vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse; and every steam-vessel shall, when in a fog, go at a moderate speed."

It is not my purpose to go into a full analysis of the voluminous proof taken in this case, as that has been sufficiently done in the exhaustive report of the commissioner, filed herein. It is sufficient for my purposes to say that it clearly appears from the proof that the Channon was proceeding on her voyage upon a southerly or nearly south course, with a light sailing breeze, at the rate of from five to six miles per hour, with the wind over her starboard quarter a little abaft the beam, when, about a quarter before 10 o'clock, her lookout saw the mast-head lights of the steamer at a long distance (say from five to seven miles) nearly dead ahead. He reported the light to the captain, who reconnoitered it through his glass and ascertained that it was the light of a steamer towing other vessels. Soon afterwards the steamer showed her green light, about a half a point or a point over the port bow of the schooner. The speed of the steamer at the time she sighted the light of the schooner, and up to the time of the collision, was about seven miles per hour. The two vessels continued to approach each other, nearly end on, until quite close—probably less than a mile of each other; and when the sails of the schooner could be seen by those on the steamer the schooner showed a torch, and shortly afterwards, thinking, as stated by one of the witnesses, that the steamer was coming right into them, the wheel of the schooner was put to port, and she luffed a point or two into the wind, and at that moment was struck upon the port bow just abaft the fore-rigging, and so injured that she sunk within five minutes.

It is contended on the part of those in charge of the Favorite that the schooner changed her course; and there is considerable testimony in the case on the part of the respondents to the effect that the lookout on the steamer first saw the green light of the schooner, from which they argue and insist that the course of the schooner must have been somewhat east of south, and that she was to the leeward or east of the course of the steamer. I do not think it necessary to attempt to reconcile the contradictions between the witnesses who were upon the schooner and those on the steamer as to which light the schooner first showed to the steamer. The testimony of

both classes of witnesses concurs in establishing the fact that the courses of the two vessels were nearly directly towards each other. The schooner was sailing south, and the steamer was going north, half west. They were approaching each other nearly end on.

It is possible that from time to time, as the schooner fell off from the wind, or luffed up into the wind, she may have disclosed her green light to the lookout on the steamer. They were approaching each other so nearly in a direct line that it is possible, and perhaps probable, that the schooner may have shown at different moments, without substantially varying her general course, each of her lights to those on the steamer. But, as I have already said, the material fact is that the two vessels were approaching each other nearly end on. The steamer made no effort to get out of the way, unless it be that at some interval of time after the light on the schooner was discovered the wheel of the steamer was put to starboard and she swung off a point or a point and a half to port, where she was steadied, and ran for a short time, until the schooner showed her torch, and very shortly after that the collision occurred. I attach but little significance to the maneuvers which were executed or attempted on the part of the schooner or the steamer when in immediate proximity to each other, and a collision was imminent. What men do, or attempt to do, under such circumstances of danger, is frequently of little import in determining the question of responsibility for a collision.

The material question is whether there was any negligence, and by whom, in allowing the two vessels to come so close together as to bring on an impending collision. It has been urged with much ability and force, on the part of the respondents, that the steamer being encumbered with tows, and having indicated that fact to the schooner by the lights carried at her mast-head, was not bound by the provisions of sailing rules 20 and 21, and that the officers of the schooner had an additional degree of responsibility thrown upon them, from the fact that they knew they were meeting a steamer towing other vessels; and, in support of this decision, I am cited to the opinion of the supreme court in the case of *The Syracuse*, 9 Wall. 672, where the court says:

"A tug, with vessels in tow, is in a very different condition from one unencumbered; she is not mistress of her motions. She cannot advance, recede, or turn either way at discretion. She is bound to consult their safety as well as her own. She must see that what clears her of danger does not put them in peril. For many purposes they may be regarded as a part of herself." Page 675.

And also to the analogous reasoning of the learned judge of the eastern district of New York in *Millbank* v. *The Schooner Cranmer*, 1 FED. REP. 256.

I think it sufficient, for the purposes of this case, to say that in both the cases cited the collisions occurred in a crowded stream or roadstead, where all vessels are charged with increased obligations of mutual care, which do not bear upon them when upon the open sea. But in this case the collision occurred upon the open lake, where there was ample sea-room to have made every maneuver necessary to insure safety. There were no other vessels to interfere with such maneuvers, and, so far as the evidence shows, no lights of other vessels to bewilder or embarrass the parties in charge of the steamer. The obvious duty of this steamer, under the sailing rules, especially as she was encumbered by her tows, was to immediately or in ample time take such steps as would prevent the two vessels from coming in dangerous proximity to each other.

By the sailing rules the schooner was bound to keep her course. There is nothing in the rules, nor in the nature of the two vessels, that requires or allows a sailing-vessel to change her course when she sights the lights of an approaching steamer with tows. Her duty under the rules is to keep her course, and the duty of the steamer is to keep out of the way of the sailing-vessel. The steamer has the right to elect on which side of the sailing-vessel she will pass, but is bound to exercise that right with sound judgment; and therefore any deviation by the sailing-vessel from her course would embarrass the steamer and endanger both. Notwithstanding the fact that the Favorite had barges in tow, she was still a steamer, and under rules 20 and 21 bound to keep out of the way of the schooner. Her officers knew that owing to the three barges astern she was, for the purposes of many maneuvers upon the lake, lengthened to the extent of her barges and the tow lines connecting them to her, and that, therefore, it would take longer to make the necessary detour from the course of the schooner in order to secure safety; and the only difference I can see between the obligation of a steamer with or without tows upon the open lake, as these two vessels were situated, is that the steamer, when encumbered with tows, must commence her maneuvers so promptly after sighting the lights of a sailing-vessel as to make sure that she will not only herself go clear of the sailing-vessel, but that her tows will also go clear.

The sailing-vessel, in a crowded roadstead, coming close to tows under the control of a tug, is, undoubtedly, bound to use such reason-

able precautions, as are in her power, to avoid a collision with the tows, and the failure to use such precautions might, under certain circumstances, be such negligence as would create liability on the part of the schooner for a collision; and this was the case of *The Cranmer, supra*, decided by Judge Benedict. But the law or rules of conduct governing such cases is not applicable to a case like this. Here was ample sea-room, and any deviation by the schooner only increased the danger of both vessels.

I conclude, from the testimony on the part of respondents, that the lights of the schooner were not sighted by the lookout of the steamer so soon as the lights of the steamer were sighted by the lookout on the schooner; and it also appears that the captain of the steamer was the officer of the deck at the time, and for an hour or more preceding the time this collision took place. While the lookout was watching the light, before he had reported it to the captain, the captain came forward, having discovered the light himself, and looked at it through his glass. His own version of what took place on his steamer, as detailed in the testimony, is substantially in these words:

"In the first place, I was walking the deck, back and forth, across, as I generally do, on the after-part, by the cabin, so I had a view of anything coming ahead and a view of the tow behind. At that time I imagined I saw a green light on the starboard bow. I walked forward and took my glass out of my state-room to look at this light, and from its situation it seemed to me she was steering out of the course, and not encroaching on us. I told the watchman to keep a smart lookout for the light. *'Don't let her get too close to us. There is no danger now. I am going aft.'* The light bore about a point and a quarter or a point and a half on my starboard bow. What called me aft, I had a call of nature. During the time I was in the closet I was hunting in my pockets for paper, and I found there a letter, a moneyed letter from London, that one of my men had given me that day. When I came out of the closet I went into my room to put the letter in the safe. As I locked the door of the safe and turned around I heard the lookout running aft on the port side of the vessel. He said: 'The green light is shut in and he i. .howing his red light and a torch-light.' I told him to run and port his helm, and followed after immediately. I also gave the order to 'port.' I went on the port side and took the bearings. I looked over my rail, across the weather side from the stem, and could not see him. Then I knew there was danger. Then I stood and took the correct bearings across about 10 feet back from the stem. Then I saw he appeared aft of our stem, on our starboard bow, across the deck, where our fore stay-sail was hauled down and rolled up in a netting. To see this light I had to rise up and look over the sail, which he bore about three points on our starboard bow. I looked at him a few seconds and saw it was impossible to clear him with our wheel a-port, as the vessel seemed

to be swinging to windward, and put my wheel starboard, in the hopes of swinging up side by side and avoiding the blow; but we came in collision immediately after the order was given to starboard, and struck the schooner in the after-part of the fore rigging. As soon as, after the collision occurred, I could get up on deck, I stopped the engine. The schooner at the time of the collision, from all appearances, was heading south-west, westerly, and the propeller was heading between north, half west and nor'-nor'-west."

According to the account given by the captain, who discovered the schooner's light about the same time as his loookout, he saw the schooner's light in such a situation as to know that the two vessels were approaching each other in a nearly direct line. He knew that it was his duty to keep out of the way of the schooner, and yet, without any orders to that effect, he simply retires to the after-part of his steamer, leaving the lookout in command on the deck under circumstances which called for instant and continuous vigilance, and required the constant attention of an experienced and responsible officer. His own speed was about seven miles per hour, and he knew the wind was such as gave the schooner nearly the same speed, and yet, after having answered the call which took him aft, the captain gave his attention to a matter which had nothing to do with navigating his ship, and which he had previously forgotten; and during the time that he was unnecessarily staying aft to put the letter in the safe, it is probable that the two vessels got into the dangerous position which produced the collision. Had the order been given at once, inasmuch as she had a right to choose on which side of the schooner she would pass, to change the course of the steamer so as to clearly indicate to those on the schooner that she was intending to give her a wide berth, and had the master returned to his duty as officer of the deck promptly after having visited the water-closet, it is probable that, with his experience and the duty devolving upon him at the time the red light and torch were shown, he could then have changed the course of his steamer so as to have avoided the collision. The amount of time which was lost may have been very inconsiderable, but it was precious time; and no conduct of his afterwards, in the management of his vessel, could retrieve that loss. When he was summoned by the call of the lookout to the command on the deck, it was too late to atone the negligence which had already occurred. So, too, the proof shows that the steamer could have been stopped in about her length by reversing her wheel, and it seems to me almost certain, in the light of the proof, that if the wheel had been reversed,

even after the torch was shown, the collision would have been prevented. It is true that, by reversing the wheel without some change in the direction of the steamer, she would have been somewhat imperilled by her tow, but that was a matter which the master should have had in mind all the time, and made the necessary maneuver with due caution; still, that does not relieve him from the obligation to reverse, if the occasion or necessity demanded it. He should have been ready to slacken speed or stop, as the exigency required, but made no effort to do so.

It therefore seems very clear to me that the collision in this case was caused by the negligence on the part of those in command of this steamer. I have very carefully read the testimony, and have carefully considered the arguments which have been made on the part of the respondents in support of their exceptions to the finding of the commissioner, and must say that I am wholly content with the conclusions at which the commissioner has arrived, in his report, and shall overrule the exceptions, confirm the report, and enter a decree for the libellants, in accordance with the recommendations of the report.