## THE OGEMAW.

### RICHARDS and others *v.* THE OGEMAW.

*(District Court, E. D. Wisconsin. November 23, 1887.)*

1. **COLLISION—VESSEL AT ANCHOR—DUTY OF BARGE AND TOW.**
   A steam barge, with a tow of five vessels, coming down a river discovered the light of a vessel at anchor nearly in the middle of the stream, distant about a mile. There was room to pass on either side. The tug passed diagonally across the bows of the vessel at anchor, about 500 feet from her; but the distance between her and the other vessels in the tow gradually diminished by the force of the current, and the last vessel in the tow struck her. *Held,* that the barge being bound to keep out of the way of the vessel at anchor, must, at her peril, shape her course for a safe margin against the contingencies of navigation, and the effect of the current.

2. SAME.

· A barge, being the last in a tow of five, crossing diagonally a river, collided with a vessel at anchor, the whole tow yielding to the force of the current, and each of the tow passing the vessel at anchor nearer than the one ahead. It was in testimony that the master of the barge, when the tow changed its course to cross the river diagonally, ported his helm, to head his vessel above the boat ahead of him, but the current drifted him down. *Held,* that the collision cannot be attributed to fault on the part of the barge.

3. SAME—VESSEL AT ANCHOR IN MID-STREAM.

A vessel anchored in the middle of a river about 1,900 feet wide, where vessels were frequently passing, leaving room on either side for them to pass. *Held,* that her place of anchorage was not improper.

4. SAME.

A vessel anchored in the middle of a river 1,900 feet wide, where vessels were frequently passing and repassing. The last boat in a tow of five crossing the river diagonally, through the force of the current struck her bow. She had her anchor light displayed, and her anchor watch on deck., Her mate seeing the danger called to the steam barge having the tow to keep off, but did not run out more anchor chain nor put the helm to port until the collision was immediately at hand. The captain was not on board. *Held,* that the circumstances of the anchorage imposed upon the vessel a degree of vigilance and care in which she was wanting, and the vessel must be held to be in part in fault.

*Markham & Noyes,* for libelants.
*Van Dyke & Van Dyke,* for respondents.

DYER, J. This is a libel for a collision between the schooner H. C. Richards, which was lying at anchor in the St. Clair river, about a mile below Port Huron, and the barge H. C. Davis, which, with other vessels, was in tow of the steam barge Ogemaw. The collision occurred in the evening of May 16, 1886. The Richards was bound on a voyage from Buffalo to Racine, Wisconsin, and with several other vessels had been in tow of a tug from Buffalo. On arrival at a point in the river near the place of collision, the tug left the Richards and two other vessels belonging in the tow astern of her, and proceeded with the rest of the tow to Lake Huron, intending to return for the Richards and her consorts, and, having brought the whole fleet together again at Lake Huron, to resume the voyage to ports on Lake Michigan. The Ogemaw was proceeding down the river with a tow of five barges. The vessels constituting the tow, naming them in the order in which they were placed in the tow, were: The Roberts, the City of the Straits, the Ketchum, the Church, and the Davis. The collision occurred between 9 and 10 o'clock in the evening. It was a clear, bright, moonlight night, and there was no wind nor sea to embarrass navigation. Bright anchor lights were displayed on the Richards and the two vessels astern of her. The anchor light of the Richards hung in the rigging about 16 feet from deck, and the second mate and one seaman were on watch.

The second mate of the Richards testifies that the vessel was lying bows up stream, with 30 fathoms of chain out, about half a mile below what is known as the "Middle-Ground," and a mile from Port Huron. The weight of the testimony on both sides is, that she was about 800 feet from the American shore. Above Port Huron and Sarnia the river flows

in a south-easterly direction, but at those points there is a bend in the stream, and for a long distance below the middle ground its course is south-westerly. As the Ogemaw passed the middle-ground she was headed directly down the river, but at that time, or soon afterwards, she changed her course so as to go between the Richards and the American shore. This put her and her tow on a diagonal course across the river, so that necessarily the vessels were more or less deflected from a direct line astern of the towing steamer, by the current. All the vessels in tow of the Ogemaw passed the Richards safely except the Davis, the last in the line. She struck the Richards on the bow, carrying away her bow-sprit, bob-stays, jib-boom, guys, and dolphin striker, and doing other damage. The Davis was also injured.

As the collision occurred with a vessel at anchor, the steamer is *prima facie* liable, and can only relieve herself by showing that the accident was inevitable, or was caused by the culpable negligence of the schooner. *The Carroll*, 8 Wall. 304. See, also, *Manufacturing Co.* v. *The John Adams*, 1 Cliff. 413, and authorities there collated. The fact that a steamer has barges in tow does not alter the rule requiring her to keep out of the way of an approaching sailing-vessel, and in such a case the steamer should take extra and timely precautions to avoid a collision. *The Favorite*, 10 Biss. 536, 9 Fed. Rep. 709; *The Civilta*, 103 U. S. 699. The principle that, where a vessel at anchor is collided with by a vessel in motion, the latter is *prima facie* in fault, provided the former is anchored in a proper place, has been enforced against a towing steamer, although the collision was not with her, but was between one of the vessels in the tow and the vessel at anchor. *The Masters and Raynor*, 1 Brown, Adm. 342; *The Worthington and Davis*, 19 Fed. Rep. 836.

Upon consideration of the testimony, I can have no serious doubt that the Ogemaw was in fault. There is dispute about the precise locality where the Richards was anchored, and about the exact width of the river at that point. The libelants contend that the place of anchorage was about half a mile below the middle-ground. From an examination of a government chart of the river, which is in evidence, I should conclude that the width of the river between channel banks at that point is about 1,900 feet. The respondents claim that the Richards was lying further down the stream, where it is narrower, and where it would seem, from measurements made on the chart, the width is from 1,600 to 1,800 feet. The testimony on the part of the libelants tends to show that the Richards was lying about one-third of the distance across the river from the American shore; while the weight of the testimony on the part of the respondents is, that she was in mid-channel. However this may be, and whether the libelants or respondents are nearest right in their understanding of the facts as to the precise location of the Richards, and the width of the river at that point, it is obvious that there was ample space on both sides of the Richards for the Ogemaw and her tow to pass. If the Richards was where the libelants claim she was, then there was a space of about 800 feet between her and the American shore, and a space of about 1,000 or 1,100 feet between her and the Canadian side of the

channel. If she was where the respondents claim she was, then there was a space of 800 or 900 feet on either side of the Richards. If the Richards was half a mile below the middle-ground, there could have been no difficulty, in the exercise of proper watchfulness and care, in passing her safely on the American side, even with as many vessels as the Ogemaw had in tow. If she was lying as far down the river as the respondents say she was, the facilities for shaping the course of the tow after leaving the middle-ground so as to pass the Richards on the American side, were very greatly increased. It is evident, as was observed in the case of *Wells* v. *Armstrong*, 29 Fed. Rep. 218, that the fault of the master of the Ogemaw was in "not allowing a sufficient margin for safety amid the contingencies of navigation, and not taking in time the decisive measures at his easy command." He evidently did not take sufficiently into consideration the force and effect of the current on the vessels in tow, as they took a diagonal course in the wake of the steamer across the river. This is apparent from the fact that the distance between the Richards, and the tow gradually diminished with each passing vessel, until at last she was struck by the Davis. The Ogemaw was between 400 and 500 feet from the Richards when she passed her; the Roberts, the next boat in the line, passed at a distance of about 400 feet; the City of the Straits was about 250 feet, and the Ketchum about 150 feet, from the Richards, when they passed her. The mate of the Ketchum says he should judge the Church was 100 feet closer to the Richards than the Ketchum was, and the master of the Church testifies that his vessel was not more than 15 feet from the Richards when she passed. Such being the proximity of the vessels in the tow to the Richards, which the course they were on steadily increased, a collision between the Davis and the Richards was inevitable; and the course the tow was on, its proximity, and manner of approach, demonstrate that the master of the Ogemaw did not sufficiently consider what was a necessary margin for safety with such a line of vessels stretched out astern of him. The duty to keep out of the way embraces the duty to keep away by a prudent and safe margin, having reference to all the contingencies of navigation. *The Aurania and Republic,* 29 Fed. Rep. 125. A steamer bound to keep out of the way must, at her own peril, shape her course for a safe margin against the contingencies of navigation and the effect of tide currents. *The City of Springfield,* 29 Fed. Rep. 923.

There was no difficulty in observing the anchor light of the Richards a sufficient distance away. Nearly all the witnesses concur in the statement that the light was seen when the tow was passing the Sarnia elevator. The master of the Ogemaw testifies that he and his second mate saw the light when it was between three-quarters of a mile and a mile off, and that when he rounded the bend of the river he was a little closer to the Canadian than the American side of the river. He then took a course which he says "was pointing dead on the lights" of the Richards, keeping that course until, as he testifies, he ported his wheel a little, "enough just to go down the middle, or a little towards the shore from the vessel,'seeing a good open road at that side, and seeing a tow ahead

going the same way." From all the evidence it is also plain that the steamer and her tow could have passed directly down the river on the Canada side of the channel without embarrassment or difficulty. It is true a propeller was then going up the river on that side, but there was ample space for her to pass, as she was a single boat without a tow. It is claimed that the course the Ogemaw took, was occasioned, in part at least, by the approach of the propeller between the Richards and the Canada shore. But the master of the Ogemaw himself testifies that he saw the lights of the propeller after he had ported her wheel to go between the Richards and the American shore; so that he must have determined upon his course before he saw the propeller at all.

Attempt has been made to charge responsibility for the collision upon the Davis. It is said that in rounding the middle-ground she did not turn soon enough; that her wheel was not promptly ported, and that she was thus suffered to get out of line by those in charge of her. It is then argued that for this alleged fault the towing steamer is not responsible. As the Davis was manned by her own master and crew, it was their duty to exercise reasonable care and skill in her navigation. *The City of Alexandria*, 31 Fed. Rep. 430. The steamer was the dominant mind and will in the adventure. It was the duty of the tow to follow her guidance, to keep as far as possible in her wake, and to conform to her directions. The exercise of reasonable skill and care within this sphere was incumbent on the tow. *The Margaret*, 94 U. S. 496. I am of the opinion that the respondents have failed to show an omission of this legal duty on the part of those on board the Davis. The testimony in support of respondent's theory in this respect consists largely of expressions of opinion. It was of course more difficult to keep the Davis, the last vessel in the tow, exactly in line with the steamer than to keep the vessels nearer the steamer in line. As we have seen, all of them gave way more or less to the force and effect of the current, the Davis, naturally, from her position, more than the others. The consequence was, that each succeeding vessel was drawn nearer to the Richards than the vessel ahead, and this explains the true cause of the collision. The testimony of witnesses who were on the Ogemaw, and on the vessels nearest to her, in support of the claim that the Davis got out of line, is necessarily unreliable, because of their distance from her; and if she did drift out of course, they were not in a situation to say whether it was attributable to fault of navigation or to the force of the current, and unavoidable embarrassment arising from her position in the tow. The master of the Davis testifies that about the time his vessel passed the Sarnia elevator, the Ogemaw changed her course to pass on the American side of the river; that in following that course he tried to head his vessel above the boat ahead of him, but that the current drifted him down; that his wheel was hard a-port at the time of the collision, and had been for some time before; and that he kept his vessel just as far over to the American shore as the appliances at his command would permit, and as was possible. He testifies further that, when he saw the Ogemaw "make the turn," he gave the order to port the wheel of his vessel; that this was done below

the Sarnia elevator, and that he knows the wheel was put to port. This testimony, coming from the officer in command of the Davis, who it appears was an experienced navigator, and thus detailing just what was done on board the Davis, outweighs the other testimony in the case, which tends, though not with much force, to attribute the collision to fault on the part of the Davis.

Having determined that negligence is imputable to the Ogemaw, it remains to be considered whether the Richards was in any manner in fault. First, it is said she was anchored in an improper place. But as we have seen, there was ample space for the Ogemaw and her tow, in the exercise of proper skill and care, to pass on either side of her.

Undoubtedly, as was said by Judge LONGYEAR in the case of *The Masters and Raynor*, *supra*, there are safer places for vessels to lie at anchor, and where they would be a less obstruction to navigation. But no law or custom is shown prohibiting vessels from anchoring at the place where the Richards was lying, and her legal right to lie there must be conceded. The case just cited was one of collision very similar to that between the Richards and Davis, and it occurred very near the spot where this one occurred. The bark Fame lay at anchor in the St. Clair river a little below Port Huron, and just opposite the foot of the middle-ground. As she so lay at anchor the tug Masters came down the river, with a tow of four vessels, the fourth vessel being the Raynor. The tug undertook to pass the bark on the American or port side of her, and between her and the middle-ground, and in doing so the schooner sagged off to port, and came in collision with the bark. There, as here, the proofs were contradictory as to the precise point where the vessel collided with, lay in the river, varying from one-third of the distance from the American channel bank to the middle of the channel. Judge LONGYEAR held that the place of anchorage was not an improper one, as there was room on both sides for the tug and tow to pass.

In the case of *The Planet*, 1 Brown, Adm. 124, it was held by Judge WILKINS that it was proper for a vessel to lie at anchor in the St. Clair river 1,000 feet from the Canadian shore, and more than 300 feet from the American shore, even with her sails up, and when there was a puffy wind, there being, as was said by the court, ample room for other vessels to pass on either side.

"If there is no rule or custom requiring a vessel to bring up out of the fairway, she may anchor there, although directly in the track of ships. Thus a vessel brought up in the Mersey directly in the track of the ferry steamers was held not to be in fault for lying there. The obligation on a ship under way to keep clear of another at anchor applies, although the ship at anchor is in an improper berth. And a vessel brought up in a berth which is improper only in the sense that it is in an exposed and dangerous position, does not thereby contribute to a collision caused by another ship negligently driving into her." Mars. Coll. 224.

In *The Worthington and Davis*, *supra*, it was held that anchorage in the St. Clair river is not necessarily improper because the channel is comparatively narrow, and vessels are frequently passing and repassing, if

room be left for vessels and tows to pass in safety. See, also, *Wells* v. *Armstrong, supra.*

As there was ample space for vessels to pass the Richards on either side, I must hold that her place of anchorage was not improper. But anchoring there as she did, she was undoubtedly bound to exercise a greater degree of care and diligence in respect to her light and her anchor watch, than would be requisite if she were anchored out of the usual path of vessels. It was her duty to keep a vigilant lookout, and to take all the precautions to avoid collision with other vessels which the exigencies of the situation might require. Mars. Coll. 224; *The Worthington and Davis, supra; The Henry Warner*, 29 Fed. Rep. 601.

As before observed, the anchor light displayed by the Richards was sufficient, and conformed to the requirements of law. Fault is found with her for not exhibiting a torch-light when the Ogemaw and her tow approached; but there is nothing in this circumstance, because the Richards was seen early enough to have avoided her, and as soon as there could possibly have been any obligation to show a torch. *The Leopard*, 2 Low. Dec. 238.

The anchor watch consisted of the second mate and one seaman. The crew of the vessel consisted of six men before the mast, the master, and first and second mates. The master was not on board at the time of the collision. The same circumstance in the case of *The Sapphire*, 11 Wall. 170, was accorded some weight in the opinion of the court, as evidence of negligence. All the crew were below except the anchor watch, but came on deck just before the collision. The mate put the wheel of the Richards to port, but it is apparent from the evidence this was not done until the collision was immediately imminent. The second mate knew there was danger when the Ogemaw was abreast of the Richards, for he says he hailed the men on the deck of the Ogemaw, and told them to keep away, and that he hailed the barges in tow, warning them to keep their wheels hard a-port. No effort was made to run out more anchor chain, thus allowing the vessel to drop down the stream with the current. In fact, nothing was done on the Richards to avoid the collision, except to hail the passing vessels, and put the wheel of the Richards to port when the collision was unavoidable. More effective measures might have been taken to avert the disaster which resulted. The second mate and seaman, constituting the anchor watch, saw the Ogemaw and her tow approaching a long distance off. It was their duty to be alert, and to call assistance from below promptly. The danger was especially apparent when they saw, as they must have done, that the tow was a long one, and that each succeeding vessel, as it passed, came in closer proximity to the Richards. If her helm had been promptly put to port, and thus, by the force of the current, the stern of the vessel had been worked over to leeward, and the bow turned off to starboard, and if, in addition to this, more anchor chain had been run out, thus allowing the vessel to drop down the stream with the current, and if all this had been done, as it might have been, before a collision was actually impending, it is highly probable the collision would have been avoided, or

that the damages occasioned thereby would have been lessened. For the failure to take such precautionary measures, Judge LONGYEAR held the vessel at anchor in fault in the case of *The Masters and Raynor*, *supra*, a case so parallel in its facts, to the case in hand, as to make it applicable here with singular force. The circumstances of the situation imposed upon the crew of the Richards the duty of exercising a degree of vigilance and care in which they appear to have been wanting. The Richards is therefore held also in fault.

Both vessels being found in fault, it follows that each must bear a moiety of the damages. A decree in favor of the libelant will be entered accordingly, and there will be a reference to a commissioner to ascertain and report the damages.