JAMES SHEWAN & SONS v. NEW ENGLAND NAVIGATION CO.

(District Court, E. D. New York. July 31, 1907.)

1. SHIPPING—DUTY OF STEAMER WITH RESPECT TO SWELL—STRUCTURES AT DOCK.

The duty of a passing steamer with respect to causing dangerous swells is the same toward a floating dry dock permanently located alongside of a pier as toward vessels in the same situation, and she is bound to exercise reasonable care to avoid causing injury to such dock, having regard to the character of the structure and its greater liability to injury from its size and therefore longer subjection to the action of the swells; and it is also the duty of the owner of the dock to take into account the same liability to injury from swells and to make reasonable provisions against it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 345.

Liability of vessel for injuries caused by creation of swell, see note to The Asbury Park, 78 C. C. A. 3.]

2. SAME—INJURY TO FLOATING DRY DOCK FROM SWELL.

Libelants were the owners of a floating dry dock 278 feet long and 90 feet wide permanently stationed alongside of a pier on East river by means of four very heavy vertical timbers or spiles driven along the side of the pier, to which the dock was secured by means of yokes or eyes of heavy lumber built around the vertical timbers, allowing the dock to move down and up as it was submerged or pumped out, or as the tide fell and rose. The large steamer Payne, owned by respondent, passed down

the river in the daytime at a distance of about 1,100 feet from the pier against a flood tide at a speed of 12 knots or more through the water, and her large swell caused the dock to oscillate to such extent as to break the end yokes and also one of the vertical timbers. *Held*, that the Payne was in fault for not reducing speed so as to avoid causing such dangerous swells; that libelants were also in fault for failing to make better provision against the action of swells from passing vessels by giving greater play to the yokes at the ends of the dock.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 345.]

In Admiralty.

John F. Foley, for libelant.
William Greenough (James T. Kilbreth, of counsel), for respondent.

CHATFIELD, District Judge. The libelants are the owners and proprietors of a stationary, but floating, dry dock, located at the south side of a slip between the piers at East Fourth and East Fifth streets, New York City. The dry dock consists of a pontoon or submerged structure, about 278 feet long, 90 feet wide, and about 11 feet deep. On this pontoon bulkheads arise for the entire length along each side, and the complete structure, up to a distance of about two feet from the top of the bulkheads, can be submerged to allow a vessel to pass in at the outside end of the dock. The total submerged draught is 33 feet. The pontoon being pumped out, the dock rises until the deck of the pontoon is out of water. In manner of construction it is similar to other wooden dry docks, but it is stationary in the sense that it is fastened by four extremely heavy vertical timbers, placed upon the south side of the dry dock and immediately along the face of the north side of the pier at East Fourth street. As the tide rises and falls, or as the pontoon of the dry dock is pumped out or submerged, the dock slides up and down next to these four timbers, while four yokes or eyes of heavy lumber, called "saddles," built around these vertical timbers, prevent the dock from moving in or out, upstream or downstream, and allow but slight play about the timbers themselves. These four vertical timbers are sunk in the ground to a considerable depth, and make the dock stationary, with the exception of the up and down motion. The testimony shows that the libelants have maintained this dock, constructed in this fashion, for a considerable period at the same spot, and that the libelants have made claims for injuries occurring from the swells of passing steamers on some occasions. The testimony also shows that there is but one other dock of this particular style so far as its mode of fastening is concerned, in the waters around New York, and that that dock is in a protected basin, rather than alongside of a waterway used frequently by large vessels, as is the East river.

The occurrence for which damages are asked was caused by the passage of the steamer William G. Payne down the East river, in the neighborhood of 11:15 o'clock in the forenoon, upon the 11th of June, 1905. At that time the tide had started to run up the river with the beginning of the flood; low water at Governor's Island having occurred in the neighborhood of 9 a. m., and the tides at the locality in question being less than an hour later than that at Governor's Island. The dock had been submerged in order to admit a boat, the steamer

Surprise, which was moored at the outside end of the Fourth Street Pier, ready to move into the dock. The testimony of the libelants is that the Payne passed within a few hundred feet of the dock, the distance varying; but from a consideration of all the testimony and of the localities referred to, and taking into account the Third street reef, shown upon the government charts almost opposite Third street, it is believed that the Payne passed down outside of this reef some little distance, and probably 1,100 to 1,200 feet from the end of the pier where the Surprise was moored. The Payne was seen by the docking superintendent of the libelants, and, as she passed, he, as also some of the witnesses who were upon the Surprise, observed her swell, and watched it strike the Surprise and the dry dock. Under the action of the swell the Surprise was considerably tossed around, but her method of mooring by lines prevented any injury to her. The dry dock, however, was carried up and down the timbers, and the yokes or saddles, passing around the outside and the inmost timbers or spiles, were broken, while the saddles upon the spiles in the center were loosened. One of the spiles, which was testified to be about 22 inches square, and 58 feet long, with 16 feet of its length driven into the river bottom, was cracked, and injuries resulted for which the libelants charge that they suffered damage for repairs, loss of service, and other incidental expenses to the amount of $1,501.43. The witnesses for the libelants estimate the speed of the Payne at from 12 to 15 knots an hour over the ground. The officers of the Payne say about 10 knots an hour, which is her rate of running under one bell in slack water. Most of the witnesses for the libelants were of the opinion that the tide was running out, but, taking into account the lapse of time, it is believed that the respondent is right as to the condition of the tide, and that it was running up the river. If this were so, the Payne, when running against the tide, which had turned at least an hour before, in order to be going down the river at the rate estimated, must have made rapid progress through the water, even if running under one bell. The size of the swell depends principally upon the speed of the boat through the water, although the progress of the swell along the shore would be retarded, and the waves would not move as rapidly down the river against the tide as they would with it. But the point with which we are interested is the size of the swells rather than their rate of progression, and it is believed that the conditions shown indicate conclusively that the swells were large, and that the Payne causes considerable commotion for a boat of her size when under way. The responsibility of a large boat such as the Payne, which is a screw steamer of considerable size, when passing up and down a narrow and much used waterway such as the East river, has been frequently considered in the courts. Many of these cases have been reviewed in a case recently decided by this court (Phœnix Towing & Transportation Co. v. The Chester W. Chapin, 155 Fed. 854), and it is unnecessary to repeat that review here. The cases, however, arising from damages to a structure either built upon the shore, or to a vessel moored at the shore, while based upon the same principles as those arising from damages to a vessel proceeding in the channel, show that the courts have taken into account the condition, manner of construction, and location

of the structure or vessel along the shore in determining whether the injured party had used reasonable care on its part to avoid injury, even more strictly than they have considered the manner of fastening, and the seaworthiness of vessels in tows or craft injured by a large steamer when passing in midstream. Injuries occurring to a structure built upon or fastened to the shore are much fewer in number than those happening to floating, temporarily moored vessels, but the permanent character of such a structure evidently requires the exercise of not only the same degree of care, but the consideration of greater possibilities and more frequent and long-continued subjection to the swells of passing steamers than would be necessary in the case of a vessel moving up and down the channel or fastened to a dock by lines.

The responsibility of a vessel passing up and down a channel, with respect to the effect of its waves upon objects along the shore, is set forth in the case of The Rotherfield (D. C.) 123 Fed. 461, in the following language:

"Where a vessel properly moored at a dock, at anchor, or not in motion, is damaged by a vessel in motion, the presumption of law is that it was the fault of the one under way; and it is presumptively liable until the contrary is shown, the burden of doing which is upon the vessel under way. The Morrisania, 13 Blatchf. 512, Fed. Cas. No. 9,838; The Tiger Lily (D. C.) 11 Fed. 745; The Worthington (D. C.) 19 Fed. 836; The Drew (D. C.) 22 Fed. 852; The Rhode Island (D. C.) 24 Fed. 295; The El Dorado (D. C.) 27 Fed. 762; The Ogemaw (D. C.) 32 Fed. 919; The New York (D. C.) 34 Fed. 757. The vessel in motion must exonerate herself from blame by showing that it was not in her power to prevent the injury by adopting any practicable precautions. The Virginia Ehrman, 97 U. S. 309, 24 L. Ed. 890; The Bridgeport, 14 Wall. 119, 20 L. Ed. 787. It is the duty of steamers passing docks or other mooring places to pass at such a rate of speed that no danger will result from her swell, or to pass at such a distance that no harm will result to a vessel, lawfully there and properly moored, from the suction produced by her passage through the water or from her displacement wave, and she is bound to know the effect of her swell. Spencer on Marine Collisions, § 72. 'A steamboat passing in the vicinity of other craft in shallow water is bound to use all reasonable precautions to avoid doing them injury from the known suction she causes.' The Drew (D. C.) 22 Fed. 852. In that case Judge Brown says: 'The liability to do damage to boats lying in shallow waters through the swell and suction of her passage is a familiar fact.' 'The undoubted right of the steamer to the navigation of the river is subject to the restriction that it must be exercised in a reasonable and careful manner, and do no injury to others that care and prudence may avoid.'"

The conclusion from an examination of the authorities and from the facts shown in this case is that the Payne was proceeding at a rate of speed and causing a swell which her officers should have been observant of. If the swell which the Payne was causing upon this trip had inflicted injury upon a tow or a boat properly moored, the authorities seem to agree that she would be responsible for the injuries caused, and there seems to be no reason why she should not be responsible to the same extent to the dry dock itself.

In the case of the dry dock there is nothing to indicate that the officers of the Payne had any reasonable ground for supposing that the dock could be injured if boats properly moored at the same distance from the passing vessel would escape injury, and their duty, therefore, was the same as to such a vessel.

The peculiar construction and the permanent location of the dry dock seem to put an obligation upon its owners as well, which does not leave them free from responsibility. Let us consider the injury which was actually caused, and compare the movement of the dock, as shown by the injury, with the movements allowed for by this method of fastening. The dock is 278 feet long, and it can readily be seen that if waves of a steamer should be so spaced that their distance from crest to crest caused the dry dock to swing in the direction of its longest dimension, with the center of the dock as a pivot; that is, if the waves should be large enough so that but one wave should lift the dock at a time, the extreme end of the dock would describe a considerable arc, while the middle portion of the dock would not move far from the direct up and down line. In the same way, if the waves were large enough to give a twisting or up and down the river motion to the whole dock, the end would be thrown up or down to a much greater distance than the center of the dock. The effect would be like the movement of a walking beam, and the long arm made by one-half of the dock's length could not afford much freedom of motion, if the saddles upon the outermost and innermost timbers or spiles were so built around the spiles as to give little freedom except in a direct vertical line. It is not considered that the method of fastening a dry dock by spiles and saddles is of itself negligent, nor is it considered that such a method of fastening is unsuitable, if sufficient freedom of motion is provided for to meet the necessities of the locality and the possibilities of motion caused by passing steamers. But in the case at bar it appears to the court that the owners of the dry dock should have anticipated that the movement at the ends of the dock would be great enough, so that more opportunity for such movement should have been provided than is shown by the testimony was afforded by the method of fastening in use.

The Payne, therefore, being negligent in proceeding in such a way as to produce an injury where under proper precautions no injury would have occurred, and under such circumstances as to make it a reasonable obligation upon the part of her officers to anticipate probable injury, and, on the other hand, the dock having been so constructed and maintained as to indicate that its owners were not free from fault, this case would seem to be a proper opportunity for the application of the rule of divided responsibility and divided damage. De Lelle v. The Atalanta (D. C.) 34 Fed. 918. The libelants, therefore, may have a decree for one-half its provable damages, the costs of both parties to be divided.