**WESTERN OIL & FUEL TERMINAL CO.
v. THE ELISHA WOODS (WESTERN
OIL & FUEL CO., Intervenor).
THE HKY 555.**

No. 22.

United States District Court
W. D. Ky. Louisville.

March 27, 1950.

Edward B. Hayes, Lord, Bissell & Kadyk, Chicago, Ill., William Mellor, Louisville, Ky., proctors for libelant.

Thomas J. Wood, Doolan, Helm, Stites & Wood, Louisville, Ky., proctors for respondent.

SHELBOURNE, District Judge.

This is a proceeding in Admiralty. The libel charges that on the morning of September 23, 1947, the barge HKY 555 was moored to a pump dock at Winona, Minnesota, discharging its cargo of gasoline into the storage tanks located on the banks of the Mississippi River, when the motor vessel Elisha Woods proceeding upstream, due to its negligent handling, maneuvering and speed, created such wave wash and suction as to break the mooring lines holding the barge, severing the hose connection and causing the loss of 38,971 gallons of gasoline, which spilled into the river.

The libel is in rem and was filed by the Western Oil & Fuel Terminal Company, as bailee in possession of the cargo of gasoline.

By subsequent pleadings, amending the libel, Western Oil & Fuel Company came into the action, adopting the allegations of the original libel and asking that recovery be had for its benefit.

The response of the Elisha Woods was a denial of all the allegations of negligence and a plea of contributory negligence. It claimed that the Terminal Company failed to have some one in charge of the unloading of the barge HKY 555, failed to warn those in charge of the Elisha Woods of any danger to the barge and negligently failed to stop operation of the pumping equipment of the barge when its danger of being dislodged from its mooring became apparent.

Having heard the evidence and considered the proof and arguments of Counsel, the Court makes the following

## Findings of Fact

1. The storage tanks, and unloading dock of the Western Oil & Fuel Terminal Company are located within the City limits of Winona, Minnesota and on the right descending bank of the Mississippi River, at which point the channel of the river is approximately 500 feet wide and the boundary of the channel on the right descending side is approximately 190 feet from the river bank.

The unloading dock of the Terminal Company is attached to the river bank and is 14 feet wide by 28 feet long. A six-inch pipeline runs from a pump flat or dock to tanks of the Terminal Company located about 180 feet from the river bank and on an elevation of 30 feet above the surface of the water.

On shore and approximately 30 feet from the dock, on an elevation 7 or 10 feet above the surface of the water, there is a valve in the pipeline designed to control the flow in and through the pipeline.

On the morning of September 23, 1947, the cargo barge HKY 555 was moored alongside the unloading dock or pump flat. The stern end of the barge was upstream, and made fast by two lines attached to "deadmen" on the bank. The bow of the barge was also made fast to lines attached to "deadmen" downstream. The barge consisted of fore and aft rakes, ten cargo compartments and pump and pumping apparatus located at the stern end.

The loaded barge was delivered and moored to the pump flat or unloading dock during the night preceding the morning of the accident. The pipelines with which the barge was equipped had been properly connected with a pipeline on the pump flat, and extended up to the storage tanks on the bank of the river. The pumping operation was in progress at about 9:15 when the motor vessel Elisha Woods was proceeding upstream with two loaded barges of oil or gasoline, each barge being 50 feet by 240 feet and made up at bow of the steamer in tandem.

The tow and the towboat made a flotilla approximately 600 feet in length.

Immediately south of the terminal of the libelant, there was located the unloading docks of the Yankhe Ice & Fuel Company. About 1200 feet south of the Terminal Company's unloading dock, a railroad drawbridge extends over the river, the opening through the draw being near the right descending bank. Extending north of either side of the draw, are two sheer fences, the one nearest the right descending bank being approximately twice the length of the fence nearer the channel.

The Elisha Woods was in charge of Captain George Ritchie, a licensed pilot of many years experience, who was thoroughly familiar with the river in that vicinity and the harbor at Winona.

As is not unusual in cases of this kind, there is a direct conflict in testimony of libelant and respondent.

For libelant, its foreman, Clifford F. Murray, testified that the barge HKY 555 was securely moored to the dock by steel cables which cables and the connections, he examined on the morning of the accident; that the day was clear, the river at pool stage and calm, with very little current.

This witness says that he first noticed the upstream end of the oil barge in the tow of the Elisha Woods, as it came through the bridge and at that time, the witness was on a stairway constructed on the elevation of the river bank from the pump dock up to the storage tanks; that the tow of the Elisha Woods appeared to be coming at an unusual angle and this witness thought faster than boats were accustomed to navigate at that point; that as the tow started passing the downstream end of the HKY 555, the waves and wash generated by the passing tow caused the HKY 555 to start surging upstream and that this witness immediately began to close the shore valve in the pipeline so as to prevent gasoline running from the storage tank back through the pipe line, in the event the pipe line should break; that as the barge continued to surge upstream, the lines from the "deadmen" on the bank to the downstream end of the barge parted, the pipeline broke, and the downstream end of the barge swung out

into the river, almost at right angles to the bank.

After closing the shore valve, the witness procured a plank from the property of the Yankhe Ice & Coal dock and made a bridge from the pump dock to the HKY 555, got on the bridge and turned off the pump, but by this time many gallons of gasoline had been emptied into the river.

This witness was largely corroborated by the testimony of Ralph M. Myer, a foreman for Yankhe Ice & Fuel Company, who was standing on the river bank on the property of his employer. He stated that he watched the Elisha Woods and her tow pass through the draw bridge and proceed upstream and that it was moving "quite fast" and faster than most boats go through there and also was closer to the right descending bank and within two barge widths of a boom on the Yankhe Ice & Coal Company premises and within two barge widths of the gas barge being unloaded at the pump dock of the Western Oil & Fuel Terminal Company; that the heavy wash of the Elisha Woods and her tow caused the boom in front of the Yankhe Ice & Coal Company premises to break loose and go out into the river.

Murray and Meyer were the only witnesses for libelant, save Erwin C. Rippie. The latter's testimony related solely to the number of gallons of gasoline lost from the barge and its price. There is no conflict in the evidence upon this score. 38,-971 gallons of gasoline were lost at a value of $.11579 per gallon. This amounts to $4512.45.

For the respondent, Warren F. Aderholt, Clerk on the Elisha Woods, Robert Ford, the mate and Captain George Ritchie, the pilot, testified.

Respondent also introduced Paul E. Pletke, a groceryman of Winona, who was called by Aderholt, and requested to call the Western Oil & Fuel Terminal Company and report to them that gasoline was escaping into the river at the unloading dock at libelant's premises.

Aderholt testified that when the Elisha Woods was some 75 yards below the Western Terminal's dock, he was in the pilot house and saw gasoline spilling into the river; that the Elisha Woods was approximately 150 yards out from the shore and that he saw no one at or by the premises of the Terminal Company.

Robert Ford, the mate, testified that the Elisha Woods signalled her desire to pass through the draw of the railroad bridge and stopped to await the opening of the draw and while she was so waiting, this witness noticed a little bit of gasoline on the water and that he then proceeded to the pilot house, where he observed the Terminal Company's unloading dock with glasses and saw gasoline running directly from the shore into the river. This witness did not observe the HKY 555 swing out into the river nor did he observe that any of the lines securing it to its mooring were broken.

He testified that the Elisha Woods and its tow created but little wash or suction and proceeded in the channel at about the customary sailing line and was proceeding at a speed past Winona of about four or four and a half miles per hour.

Captain Ritchie testified he observed gasoline on the water as the Elisha Woods passed under the bridge, but that he could not tell where it was coming from and that he saw no one at or by the premises of the Terminal Company to whom he could give any warning about the seeping into the river of the gasoline.

It is, therefore, found from the evidence that on the occasion in question, the Cargo Barge HKY 555 was properly docked at the Western Oil & Fuel Company's dock, securely tied with four steel lines and displaying two red flags indicating the unloading of oil.

That the dock of the Terminal Company had been in use for approximately four years without a similar mishap; that the Motor Vessel Elisha Woods, pushing two laden gas barges each 240 by 50 feet, arranged in the tow in tandem, passed up river approximately five-barge widths from the river side of the HKY 555 at a point where the channel of the river was of sufficient width for the Elisha Woods to have passed at a distance from the moored barge of approximately 700 feet.

That the wash, waves and swells created by the Elisha Woods caused the hawsers attached to the down-stream end of the HKY 555 to part and the pipelines to break, thereby discharging 38,971 gallons of gasoline into the river.

That the pilot and crew in charge of the Elisha Woods did not maintain a proper lookout for the HKY 555 and did not by the exercise of practicable precaution avoid causing such waves and swells.

That C. J. Murray, foreman of the Western Oil & Fuel Terminal Company was not negligent in failing to warn the pilot and crew in charge of the Elisha Woods of the danger to the moored barge and was not negligent in failing to disconnect the pump before the gasoline escaped into the river.

## Conclusions of Law

The general rule of law applicable in the instant case is stated in Martin Marine Transport Co. v. United States, D.C. Pa., 66 F.Supp. 673, at page 676—"In the disposition of claims for damages resulting from swells produced by another vessel, it is to be remembered that each case depends upon its own special facts. (Citing cases) The general rule, however, is: 'Where a vessel properly moored at a dock, at anchor, or not in motion, is damaged by a vessel in motion, the presumption of law is that it was the fault of the one under way;' * * * The Rotherfield, D. C., 123 F. 460, 461."

In The Southern Cross, D.C.N.Y., 21 F.2d 75; The Secony #4, D.C.N.Y., 21 F.2d 75, 76, a passing tug, with an oil barge 235 feet long by 38 feet wide, was held to be the cause of swells, which parted the lines of two moored barges, causing one of them to go aground. The Court said—"It is not a question of the precise speed of the No. 4, but whether her speed, when passing as she did the Southern Cross, was sufficient to inflict the damage, and as I have found, she was guilty of negligence in passing at such speed."

The negative testimony of the witnesses in charge of the passing tug, to the effect that they did not see any barges swing around and that no one saw the barges swing out, was rejected in the face of the positive testimony of witnesses for libelant.

In The Priscilla, D.C.N.Y., 15 F.2d 455, 456, the facts are similar to those in the case at bar. There, the barge was loaded with railroad cars and moored at the regular dock. The Priscilla passed the barges from 200 to 300 feet off and her swells caused the moored barge to roll, precipitating two of the loaded freight cars into the river. The crew of the Priscilla disclaimed any knowledge of the accident. One witness testified that there was no pitching or rolling of the barge. The Court said—"Nevertheless the accident occurred, and it did so when the float was being handled in the usual manner by an experienced tug captain and crew. It has been shown by undisputed testimony that the cars on the float were firmly secured and fastened. In addition to the tug captain, several witnesses of the accident, who are not now employed by libelant, testify that the swells of the Priscilla on the morning in question were of unusual height, and that they caused the float to toss and pitch, so as to cause the dumping of the cars. Aside from the fact that these witnesses probably overestimated the height of the swells, as measured in feet, there is no reason to discredit their version of the occurrence. When considered in conjunction with the fact that the float was in the slip, being gently pushed toward the bridge, and that there is nothing other than the swells of the Priscilla to account for what happened, the testimony should entitle libelant to a decree."

In The Rotherfield, supra [123 F. 461], the Court said—"Where a vessel properly moored at a dock, at anchor, or not in motion, is damaged by a vessel in motion, the presumption of law is that it was the fault of the one under way; and it is presumptively liable until the contrary is shown, the burden of doing which is upon the vessel under way. (Citing Cases) The vessel in motion must exonerate herself from blame by showing that it was not in her power to prevent the injury by adopting any practicable precautions. The Virginia Ehrman, 97 U.S. 309, 24 L.Ed. 809; The

Bridgeport, 14 Wall. 119, 20 L.Ed. 787. It is the duty of steamers passing docks or other mooring places to pass at such a rate of speed that no danger will result from her swell, or to pass at such a distance that no harm will result to a vessel, lawfully there and properly moored, from the suction produced by her passage through the water or from her displacement wave; 'and she is bound to know the effect of her swell. Spencer on Marine Collisions, § 72. 'A steamboat passing in the vicinity of other craft in shallow water is bound to use all. reasonable precautions to avoid doing them injury from the known suction she causes.' The Drew, D.C., 22 F. 852. In that case Judge Brown says: 'The liability to do damage to boats lying in shallow waters through the swell and suction of her passage is a familiar fact.' The undoubted right of the steamer to the navigation of the river is subject to the restriction that it must be exercised in a reasonable and careful manner, and do no injury to others that care and prudence may avoid.' The Morrisania, supra [Fed.Cas., No. 9,838, 13 Blatchef. 512]."

See also James Shewan & Sons v. New England Co., D.C.N.Y., 155 F. 860, same case on Appeal 2 Cir., 169 F. 285; The Chester W. Chapin, D.C., 155 F. 854; The Asbury Park, D.C., 138 F. 925; Ross v. Central R. R., D.C., 146 F. 608; The Majestic, 2 Cir., 48 F. 730. In The Majestic (last cited it was held that the smaller craft, relying on the presumption that the larger craft will take proper precaution, is under no obligation to warn the larger craft if the smaller craft is in a proper place and navigated properly and according to general rules. In The Luke, D.C.N.Y., 19 F.2d 923; The Alexander Hamilton, D.C. N.Y., 19 F.2d 923, the Court held the Alexander Hamilton liable for not slacking her speed and for passing the tow at a distance of 350 feet, thereby causing damage to her tow by suction, waves and swells.

It is concluded that the Elisha Woods was negligent as a matter of law in passing the HKY 555 at such close proximity and at a speed of approximately five miles per hour, when the proper lookout would have revealed that the HKY 555 was in shallow water, where swells, waves and suction are greater than in deep water.

### Conclusion

The Libelant, Western Oil & Fuel Terminal Company is entitled to a decree awarding it a judgment in the amount of $4,512.-45, with interest and costs.