THE MAJESTIC.

THE NANNIE LAMBERTON.

NELSON v. THE MAJESTIC AND THE NANNIE LAMBERTON.

(Circuit Courtcof Appeals, Second Circuit. December 14, 1891.)

1. SHIPPING—INJURY BY SWELL FROM STEAM-SHIP.
   An ocean steam-ship, passing up New York bay, when near Bedloe's island overtook and passed a tug with a heavily laden canal-boat lashed on either side. A displacement wave produced by the steam-ship, three feet or more high, struck the tug, and threw her with such force against one of her tows as to break in the side of the tow. The steam-ship's officers testified that she passed the tug half a mile to the westward, and that her speed had been 11 or 12 knots an hour, but was reduced to 7 knots at a point below Bedloe's island. The weather was fine, and the bay smooth, and there was nothing to render navigation of the bay by the tug and her tows on that day imprudent. *Held*, that the steam-ship was liable for the injuries to the tow, and that it was no defense that her displacement waves did not render navigation in the bay more perilous for tugs and tows than would a high wind, nor that she was navigating at a speed customarily adopted by vessels of her class. 44 Fed. Rep. 813, affirmed in part.

2. SAME—DUTIES OF OVERTAKEN TUG—TOWAGE.
   The tug was not in fault for failure to turn the stern of her tows directly to the the wave, she being the overtaken vessel, and her master having the right to assume that the steam-ship would take proper steps to avoid disaster; and this, though the master saw the wave some little time before it struck, as he might reasonably expect a decrease in the wave before it would reach his vessel. 44 Fed. Rep. 813, reversed in part.

In Admiralty.

Appeal from the circuit court of the United States for the southern district of New York. Libel against the steam-ship Majestic and the steam-tug Nannie Lamberton for damage to the canal-boat Emma while in tow of the tug. Decree against the claimants of both vessels. Both appeal. Decree affirmed as to the Majestic, but reversed as to the Nannie Lamberton.

*George De Forest Lord*, for the Majestic.

*Edward D. McCarthy*, for the Nannie Lamberton.

*Josiah A. Hyland*, for libelant.

Before WALLACE and LACOMBE, Circuit Judges.

LACOMBE, Circuit Judge. By the decree of the district court for the southern district of New York, damages were awarded in favor of the libelants against both claimants, for injuries sustained by the canal-boat

Emma, on June 1, 1890. In the afternoon of that day the Emma was navigating the waters of the upper bay of New York, bound from the Erie Basin, Brooklyn, to Hoboken, N. J. She was lashed to the starboard side of the tug Nannie Lamberton; another boat, the Mildred, being lashed to the tug's port side. The Emma was loaded with a full cargo of grain. She was a good, stanch river boat, and, so far as appears, entirely fit to navigate the upper bay in ordinary weather. It was a clear, pleasant day, with but little wind, and the waters smooth. There was nothing in the situation when her voyage began to call for any different method of towing, as by a hawser, or to render it imprudent for such a craft to venture forth. The tug and tows had reached a point beyond the northerly line of Buttermilk channel, a little to the north-east of the bell-buoy, off Governor's island, when they were struck by a displacement wave from the steamer Majestic. The wave was encountered broad-side, or nearly so. It threw the tug against the side of the Emma with such force that the side of the latter, a little aft of amid-ships, was broken in, and she thereby sustained the injuries complained of. The Majestic is 582 feet long, 57 feet beam, drawing on this occasion 20 feet forward, and 22 to 23 feet aft. She has twin screws, and is one of the fastest boats that travel on the ocean. She was bound in from sea for pier 39, North river, and passed the tug and tows to the westward. The witnesses for the libelant and the tug testified that she passed them at a distance of 700 to 800 feet. The officers of the Majestic fix the distance at half a mile, or more, but this is an inference from their recollection as to the steamer's usual course. None of them saw the tug and tows either before, at, or immediately after collision. The witnesses for the libelant and the tug estimate the speed of the steamer at from 12 to 15 miles an hour. The officers of the Majestic testified that her speed from quarantine up was 11 to 12 knots, until at a point below Bedloe's or Liberty island it was reduced to 7 knots. The swells which struck the tug and tow were three feet or more high. The first of them rolled on to the deck of the Emma, which was that distance above the water. It was, according to the master of the tug, who has navigated the upper bay for four years, a bigger swell than is usually thrown out by steamers; a fact he attributes to the effect of a double screw, though the steamer's officers say there is no difference between the waves generated by double and by single screws. The captain of the Majestic testified that, at the lower rate of speed, her displacement wave would have no effect whatever at the distance of 1,000 feet. The fact that the tug and tows were in shallow water no doubt increased the swells, but it seems probable that the wave which did the damage was thrown off while at the higher rate of speed, and that the steamer passed considerably nearer than half a mile. Be that as it may, however, it is plain, upon the proof, that a wave was thrown up by the steamer, which made navigation unsafe for the canal-boat, although she was, so far as appears, a proper craft to navigate the waters of the upper bay, and was attached to her tug in a proper way for towing with the natural conditions of wind and waves, such as they were that day. If, when moving

at seven knots an hour, and the distance of half a mile, the Majestic produces such results, then there is something in her size or build which makes it necessary for her officers to be watchful of craft they pass at that distance, as well as of those in the immediate vicinity, and to regulate her motions accordingly. It will not do to say that the swell she throws is no higher than such as are produced by a high wind in these waters. A high wind had not, on this particular day, rendered the bay unsafe for river craft. They were entitled to navigate there, and the proposition cannot be maintained that harbor waters may be put at all times and at all seasons in as perilous a condition for smaller craft, by the rapid movements of large ocean steamers, as they are occasionally by the prevalence of a gale of wind. Such waters are not to be appropriated to the exclusive use of any one class of vessels. We do not mean to hold that ocean steamers are to accommodate their movements to craft unfit to navigate the bay, either from inherent weakness, or overloading, or improper handling, or which are carelessly navigated. But of none of these is there any proof here, and, in the absence of such proof, we do hold that craft such as the libelant's have the right to navigate there without anticipation of any abnormal dangerous condition, produced solely by the wish of the owners of exceptionally large craft to run them at such a rate of speed as will insure the quickest passage. To hold otherwise would be virtually to exclude smaller vessels, engaged in a legitimate commerce, from navigating the same waters. Nor will it do to say that the Majestic was navigating in the way and at the speed customarily adopted by vessels of her class. If such way and speed cause injury to a seaworthy craft of a kind properly in these waters, and properly handled, the custom will have to be modified, or the privilege paid for. Nor is there anything in the suggestion that the swells of the steamer could have been safely met, end on, and therefore were not dangerous, for she was an overtaking vessel, and threw her swells upon the tug and tows from a quarter whence they were not bound to look for danger.

The district court held the tug also in fault because she did not turn the tow's stern directly to the wave. In this opinion we cannot concur. She was not bound to look out for danger from an overtaking vessel. As the overtaken vessel, she was to keep her course. No regulation required signals from her. It was broad daylight, and she was plainly visible. Her master did, in fact, see the Majestic some time before she came abreast of the tow, but he was entitled to assume that she would take proper measures to avoid disaster; and, though he saw the wave some little time before it struck, he might reasonably have anticipated that it would decrease in traversing the space it had to travel. We are unwilling to lay it down as a rule of navigation that tugs, towing in harbors, must always turn the sterns of their tows to the swells cast by overtaking steamers.

The decree is reversed, and the case remanded, with instructions to enter a decree against the Majestic and her stipulators for the libelant, for the full amount of her damages, with interest from the date of the

report of the commissioner in the district court, and for her costs in the district court, and for the owner of the Nannie Lamberton for costs of this court.