## THE NEW HAMPSHIRE.

### (District Court, S. D. New York. April 20, 1898.)

SWELLS NEAR PIERS—EXCESSIVE SPEED—NEGLIGENCE IN MOORING.

The steamer Y., moored at pier 1 North river, had her windlass broken by the sudden strain of surging in and out in the swells of the steamer N. H.; *held* that the damage was due to unusual swells made by the N. H., either through her excessive speed or going too near to the piers, and also to the failure of the Y. properly to take in her slack lines as the tide changed; and that the damage should be divided.

This was a libel in rem by Robert Mackill against the steamboat New Hampshire to recover for damages to a steamship from swells while moored in the slip.

Convers & Kirlin, for libelant.

Hoffman Miller, for claimant.

BROWN, District Judge. The above libel was filed to recover for damages to the steamship Yarrowdale, moored on the south side of pier 1, North river, by swells caused by the steamboat New Hampshire in passing near the slip at about 5:15 on the morning of August 3, 1897. The steamship was moored to the wharf with her bow in. She had two lines leading forward, one of them a manilla hawser, which was fastened around the port end of the drum of the windlass, and the other a steel wire rope, which coming from the spile through the steamer's forward starboard chock took one turn around the starboard end of the windlass, and was then carried to the iron bitts about four or five feet aft of the windlass. Her witnesses testify that the New Hampshire passed a few hundred feet from the end of the slip, and that her waves were unusual and caused the Yarrowdale to surge forward on her lines with such force that on the recoil the windlass was broken on the starboard side in taking up the strain from the wire rope.

There is considerable conflict in the testimony about the speed of the New Hampshire and the size of the waves she caused. She is a large Sound steamer, plying regularly between New York and Stonington. There is no evidence that, as ordinarily run, her waves do damage to vessels moored in the slips. On the other hand, it appears that the Yarrowdale had been moored at the same place for two weeks in the same manner that she was moored on the morning of the 3d, and that she had received no injury from any passing vessel. The New Hampshire, making three trips a week, must have passed this slip at least 12 times previously while the Yarrowdale was moored there.

As evidence that the New Hampshire could not have been going at an excessive rate of speed, it is urged that in rounding the Battery she had been obliged to slow, and that she only started up her engines when about opposite pier 1; while the witnesses for the libelant testify that her rapid speed was noticed and commented on just before the damage was done.

The primary question is not the question of the precise speed of the New Hampshire. In passing the slips a steamer is bound to go at such moderate speed and at such a distance away that her waves will not do damage to ships properly moored in the slips that she passes. If a given steamer at a speed of 10 knots within 500 feet of the slips, sends damaging waves into the slips, that speed and proximity are not lawful for her. The size of each steamer's waves when they reach the slips depends upon her model, the speed of her propeller, and her distance from the docks; and every steamer must take the risk of regulating her speed and distance accordingly. I am satisfied from the evidence that the waves of the New Hamp-

shire on the morning in question were much above the usual wave disturbance. This may have arisen partly from being nearer the slip than usual, and partly from putting her propeller at full speed ahead opposite the wharf.

The weight of evidence, I think, establishes the fact that it has long been the customary practise to use wire ropes for mooring and for fastening around the windlass; so that I cannot hold this to have been improper in this case. But from the great rigidity of steel ropes, there is more need of attending to the slack of the fastenings than when manilla ropes alone are used, to prevent injurious surging.

I must sustain the defendant's contention that there was negligence on the part of the Yarrowdale in not taking up the slack of her lines at about the time of this accident. The master's evidence is explicit that such changes in the lines are proper and necessary at different stages of the tide. At the time of the accident, the tide was near low water. If the slack was less, and the need of taking it up was somewhat diminished by the fact that the vessel was low down when her loading was completed, the evidence does not warrant the finding that it could be neglected altogether. The watchman, indeed, testifies that the lines at the time of the accident were right. But the circumstances satisfy me to the contrary. The lines had not been changed during the 12 hours previous. The accident, as I find, arose from the combined effect of unusual waves from the New Hampshire while passing too near the slip or at too great speed, together with too much slack in the lines of the Yarrowdale. The accident would not probably have happened without both causes concurring; and it follows, therefore, that the damages should be divided.

Decree accordingly.