## THE ASBURY PARK.

### (District Court, S. D. New York. December 1, 1905.)

SHIPPING—STEAMER CAUSING DANGEROUS SWELL—LIABILITY FOR INJURY OF ANOTHER VESSEL.

> A large steamer which proceeds at such speed as to create a swell which causes injury to another vessel of a kind properly in the waters which she is navigating, and which is properly handled, is liable for such injury.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, § 345.]

In Admiralty.

Carpenter, Park & Symmers, for libellant.

De Forest Brothers and Robert D. Benedict, for claimant.

ADAMS, District Judge. This action was brought by Alice Reilly, the owner of the barge Jim, to recover the damages claimed to have been sustained by reason of the swells made by the steam propeller Asbury Park, in passing the Jim, on the 26th day of September, 1904, about ⅜ of a mile to the southward of Pier A. The Jim, a covered barge, was taken in tow on the starboard side of the tug Ramapo at Pier 11, North River, and left there between 9 and 10 o'clock in the forenoon, to be towed to Jay Street, Brooklyn. The Asbury Park was coming up from the Atlantic Highlands, where she left at 8.39 o'clock, bound to pier 8 North River, which she reached at 9.39 o'clock.

It is testified by the libellant's witnesses that the Asbury Park passed quite close to her, estimated by the pilot of the tug to be about 300 feet distant and by the master of the barge some 1200 or 1500 feet. The Asbury Park contends that on this morning she was pursuing her usual course and while the tug and tow were not noticed, there must have been 1500 or 2000 feet between them. The distance is not very material. The question in this connection is, did she damage the boat by her swells and, if so, is she liable therefor.

The testimony on the part of the libellant is positive that the Asbury Park's swells caused the barge to roll so much that her upper works were nearly in contact with the tug's pilot house and actually pulled a towing bitt out of its place, as well as splitting a plant in the bow deck and another in the side of the barge. The barge was in good condition and it seems that the first question must, therefore, be answered in

the affirmative, notwithstanding the fact that the Asbury Park was doubtless proceeding as she passed at a reduced speed. It seems that it was her custom to slow down off Ellis Island to 8 or 10 miles an hour, and thereafter to proceed cautiously to her pier. It is testified on her behalf that almost on every trip she passes tows at reduced speed without injuring them and it is urged that there was no reason to believe that she would injure this tow in passing, but the fact that she did actually injure it is too strong for argument in this connection. If her premises are sound, the deduction here is that her speed was not as moderate as she claims.

The question as to her liability in any event has been earnestly contested and the case of The Daniel Drew, 13 Blatchf. 525, Fed. Cas. No. 3,565, cited as relieving her. There a large tow of loaded boats was being brought down the Hudson River by the tow boat Ohio on the 2nd day of June, 1873. The Drew, a passenger steamer, in passing at the rate of 18 miles an hour, created a swell which threw the boats in the tow together and injured some of them. In Judge Hunt's opinion there are many expressions which would be favorable to the Asbury Park here and they have been fully quoted in the claimant's brief. If they were all to be regarded as authoritative and expressive of the law, this libel would probably have to be dismissed but later authorities have established a different rule, which seems to fasten responsibility upon the defending vessel here.

The Daniel Drew was distinguished in some cases and in others a different doctrine prevailed. See The Drew (D. C.) 22 Fed. 852; The Rhode Island (D. C.) 24 Fed. 295; The New York (D. C.) 34 Fed. 757; The Majestic (D. C.) 44 Fed. 813; The Majestic, 48 Fed. 730, 1 C. C. A. 78; The New Hampshire (D. C.) 88 Fed. 306; The Kaiser Wilhelm der Grosse (D. C.) 134 Fed. 1012; The Asbury Park (D. C.) 136 Fed. 269.

The Majestic (D. C.) 44 Fed. 813, in this court resulted in a division of the damages between the towing tug and the passing steamer, which created the swells. On appeal (48 Fed. 730, 1 C. C. A. 78) the decision was reversed as to the tug and the steamer held solely liable. Judge Lacombe in writing for the court said (pages 731, 732 of 48 Fed., pages 80, 81 of 1 C. C. A.):

"The captain of the Majestic testified that, at the lower rate of speed, her displacement wave would have no effect whatever at the distance of 1,000 feet. The fact that the tug and tows were in shallow water no doubt increased the swells, but it seems probable that the wave which did the damage was thrown off while at the higher rate of speed, and that the steamer passed considerably nearer than half a mile. Be that as it may, however, it is plain, upon the proof, that a wave was thrown up by the steamer, which made navigation unsafe for the canal-boat, although she was, so far as appears, a proper craft to navigate the waters of the upper bay, and was attached to her tug in a proper way for towing with the natural conditions of wind and waves, such as they were that day. If, when moving at seven knots an hour, and the distance of half a mile, the Majestic produces such results, then there is something in her size or build which makes it necessary for her officers to be watchful of craft they pass at that distance, as well as of those in the immediate vicinity, and to regulate her motions accordingly. It will not do to say that the swell she throws is no higher than such as are produced by a high wind

in these waters. A high wind had not, on this particular day, rendered the bay unsafe for river craft. They were entitled to navigate there, and the proposition cannot be maintained that harbor waters may be put at all times and at all seasons in as perilous a condition for smaller craft, by the rapid movements of large ocean steamers, as they are occasionally by the prevalence of a gale of wind. Such waters are not to be appropriated to the exclusive use of any one class of vessels. We do not mean to hold that ocean steamers are to accommodate their movements to craft unfit to navigate the bay, either from inherent weakness, or overloading, or improper handling, or which are carelessly navigated. But of none of these is there any proof here, and, in the absence of such proof, we do hold that craft such as the libellant's have the right to navigate there without anticipation of any abnormal dangerous condition, produced solely by the wish of the owners of exceptionally large craft to run them at such a rate of speed as will insure the quickest passage. To hold otherwise would be virtually to exclude smaller vessels, engaged in a legitimate commerce, from navigating the same waters. Nor will it do to say that the Majestic was navigating in the way and at the speed customarily adopted by vessels of her class. If such way and speed cause injury to a seaworthy craft of a kind properly in these waters, and properly handled, the custom will have to be modified, or the privilege paid for."

No other discussion of the matter seems to be necessary and there will be a decree for the libellant, with an order of reference.