## THE CHESTER W. CHAPIN.

### (District Court, E. D. New York. July 29, 1907.)

1. SHIPPING—INJURY TO TOW FROM SWELL—NEGLIGENT NAVIGATION OF STEAMER.

A vessel causing injury to others by her swell must be held responsible for any failure to appreciate the reasonable effect of her own speed and motion through the water at the particular place and under the particular circumstances where the injury occurred, and her officers are required to take into consideration other vessels which· may reasonably· be expected to be affected, and to take all reasonable precautions to avoid their injury, even though former experience has shown that in the ordinary and usual course of events they are likely to escape injury, and a tug with small craft in tow, if properly managed, with the tow properly arranged, has the right to assume that a larger craft will observe such reasonable precautions and is under no obligation to warn her of the danger.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 345.

Liability of vessel for injuries caused by creating swell, see note to The Asbury Park, 78 C. C. A. 3.]

2. SAME.

, A tug with three scows loaded with sand in tow tandem with 4 to 5 feet between them was passing down the channel in East river to the west of Blackwell's Island in the daytime on an ebb tide, when she saw the steamer Chapin coming up a distance of· about nine streets below, and gave her a signal of one whistle. This was not answered, and the tug blew alarm whistles, but the Chapin did not answer and kept her course and speed, and as she passed within 75 to 100 feet from the scows her swells caused them to bump together, and one was turned over and seriously injured. The Chapin was about the middle of the channel, which was from 1,000 to 1,100 feet wide, and was proceeding through the water at a speed of from 15 to 18 miles. The tow was made up in the proper and usual manner. The Chapin was a large screw steamer, creating a considerable swell, and which made almost daily trips up the river and was accustomed to meeting tows and scows. Held, that her master must be presumed to be acquainted with the amount of disturbance caused by her and its probable effect on the meeting scows, and that she was in fault and liable because of his failure to reduce his speed or keep at a greater distance.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 345.]

In Admiralty.

William Greenough, for claimant.

John F. Foley (W. J. Martin, of counsel), for libelant.

CHATFIELD, District Judge. This action arose from a claim for injuries to three scows constituting a tow, all of which scows belonged to the libelant. The tow met the steamer Chester W. Chapin when proceeding down the East river in the channel to the westward of Blackwell's Island upon the 14th day of July, 1906, about 6 o'clock in the afternoon, in daylight, under the influence of an ebb tide, and the swell of the Chapin brought the scows in contact with each other, with resulting injuries. The three scows were in tow of a tug, the C. R. Stone, and were fastened one after the other; the scow Dauntless being the middle one of the three. The tow had started from Hempstead. The three scows carried upon their decks gravel and sand,

each scow being loaded in the customary manner and with an ordinary quantity of material. The tug was connected with the first scow by a hawser 15 fathoms in length, and the three scows were fastened together by two hawsers, one to port and one to starboard, between the first scow and the Dauntless, and two hawsers, one to port and one to starboard, between the Dauntless and the third scow. The channel to the westward of Blackwell's Island, and down to a point opposite East Forty-Sixth street, is from 1,000 to 1,100 feet in width, and the string of scows was 350 to 400 feet out in the channel. When the tug had reached Fifty-Third street, the captain, who had had 18 years' experience in navigation, and had been employed 3 years in hauling sand, testified that he saw the Chapin at Thirty-Fourth street. His tug was then opposite Fifty-Third street, and he blew one whistle to indicate that he would pass to port of the Chapin. This whistle was not answered, and at Forty-Ninth street he blew an alarm whistle. The Chapin, however, without answering, proceeded up the river and passed at a distance of about 75 feet, going, as the captain of the tug estimated her speed, 15 statute miles an hour. The captain estimated that the ebb tide was running at the rate of five miles an hour, and that the swell from the Chapin caused the scows to bump several times. During the bumping, the port hawsers fastened to the scow Dauntless parted, and (the starboard hawser holding), as the scow filled, she turned over, and the load of sand was precipitated into the water. The tug took the scow Dauntless ashore, left her there wrong side up, and proceeded with the other scows to Twenty-Third street. The captain testifies that there was no wind except an ordinary breeze, that he ordinarily meets the Chapin two or three times a week, and that the swells caused by the Chapin on this occasion were large. It appears that the hawser which was parted was a nine-inch hawser. The captain of the Dauntless testifies that his scow bumped into the scow ahead, breaking the planks, and that the third scow took the stern and a portion of the deck out of the Dauntless in the same manner.

On behalf of the Chapin, testimony was given by her captain and the quartermaster, who was in the pilothouse. They had no recollection of the occurrence, but testified that on the day in question the Chapin had proceeded up the river, on her way to New Haven, at her usual rate of speed, had slowed down at Man of War's Rock, opposite Forty-First street, and then proceeded up the West Channel along Blackwell's Island, but had not regained full speed at the time of reaching Forty-Sixth street. Evidence was given as to the time it had taken the Chapin to go from her pier in the North river to Hell Gate, but this evidence is of use to determine only what average speed the Chapin could make against the tide which existed upon that day. This distance as shown on the chart is about 9¼ miles, which being covered in 42 minutes would show an average of nearly 12 knots an hour over the ground, and this speed was maintained against the ebb tide. It is fair to assume, therefore, that the Chapin was going at a very rapid rate through the water at all times when she was not actually slowed down.

The testimony shows that the scows were fastened some four or five feet apart, this being the customary method of fastening scows of this

sort, loaded as these scows were, for passage through the East river. The scows were in good repair and seaworthy. There would appear to be no negligence on the part of the scowmen in their method of towing the scows, and the captain of the tug, observing the Chapin in good season, had a right to be navigating in the place in which he was, and to assume that the Chapin would not pass within such a distance or at such a rate of speed as to cause damage. The libelant's witnesses place the Chapin somewhat to the westward of the center of the channel, but the distances given by them, and the general situation, seem to indicate that the Chapin was proceeding about in the middle of the channel at the point of meeting. The water is deeper on the westward side of the river than on the eastward, and a point 450 to 500 feet from the New York shore would be approximately in the center of the river. The Chapin was therefore as far to the westward and as close to the tow as she could legally be, under article 25 of the inspectors' rules [U. S. Comp. St. 1901, p. 2870], requiring her, in narrow channels, to keep to the starboard side, when safe and practicable so to do. The Galatea, 92 U. S. 439, 23 L. Ed. 727; The Lowell M. Palmer (D. C.) 58 Fed. 701.

The number of cases arising from injuries caused by the swell of steamers is very great, and the reported decisions are many in number. One of the earliest cases, that of the Daniel Drew, 13 Blatchf. 523, Fed. Cas. No. 3,565, arose from an injury occurring under circumstances almost identical with the situation shown in the present case. The Daniel Drew was a Hudson river steamer, and the accident occurred at a point in the Hudson river where the channel was about 1,000 feet in width. In this channel the Drew met a tugboat, the Ohio, followed by a number of scows in tow, the first of the scows being attached to the tug by a hawser, and the various scows being fastened by lines to each other, with a space of some six feet between the different tiers. The Drew was proceeding at customary speed. The water was deep, and the officers of the Drew took no notice of the Ohio and her tow. The officers of the Ohio, on the contrary, saw the Drew approaching and held their course. There was one circumstance, however, in the case of the Drew which differs from that of the Chapin. The officers of the Ohio assumed that the Drew was not proceeding at such a rate as to cause them injury, and gave no signals of warning. In the case of the Chapin the pilot upon the tug saw the Chapin approaching, apprehended danger from the situation, and blew a signal to indicate the course of the tug, and to attract the Chapin's attention, but, like the pilot of the Ohio in the Drew Case, did not change his course. The opinion in the case of the Drew has been taken as a basis for the decisions in most of the subsequent cases, and nearly all of the opinions subsequent have distinguished the facts in those respective cases from the facts in the Daniel Drew. The court finds in the Drew Case that she—

"was proceeding at her customary speed, which was not unusual for passenger boats, and not unreasonable, and made no unusual swell. * * * There is no law which limits the space a boat may occupy, or which prescribes how fast it may go, or how much swell it may cause, or how near it may pass to another boat. The rule of permission or of restriction depends in each case upon the reasonableness of the thing done. * * * Nor is a large

vessel, under all circumstances, absolutely liable for an injury caused by its swells to an inferior vessel. The waters are open to the use of all kinds of crafts, large as well as small, and, while the rights of the smaller are to be carefully guarded, they are not to be made a pretense for excluding, or preventing the practical use of, larger or different vessels. * * * Is there any greater or more stringent test of liability than that a large vessel shall use its large powers with care and diligence?"

The decision seems to have turned upon the fact that none of the witnesses, either on behalf of the Ohio or the Drew, testified that the Drew was going at what seemed to them too rapid a rate. The court further said:

"I am not justified in holding, upon the testimony of all the witnesses, that the swell made by the Drew was unusually large, or that it was dangerous in any other manner than as danger is necessarily incident to the swell from a passing vessel."

A number of cases have arisen from damage done by the Asbury Park, which navigates the harbor of New York, and which, as these cases have determined, is a boat causing large and unusual swells. The ground of holding the Asbury Park liable in all of these cases seems to be that the Asbury Park is responsible for creating swells which are dangerous to a reasonably seaworthy boat, when the injury occurs under such conditions that the officers of the Asbury Park are considered by the court to have been negligent in not appreciating the probability that damage may result, under circumstances which were so brought to their attention, or of which they should have been cognizant, so as to make it negligent on their part to maintain the speed of the Asbury Park at the rate which was maintained when the accident happened. The Asbury Park (D. C.) 136 Fed. 269; The Asbury Park (D. C.) 138 Fed. 617; The Asbury Park (D. C.) 138 Fed. 925. In the latter case the court held that:

"The navigators of the Asbury Park had full opportunity to observe the size, progress, and range of her waves, and to judge of the force of their contact with vessels at either side of a waterway."

It is no answer to an injury to say that property had not been injured upon other previous occasions. The Asbury Park (D. C.) 138 Fed. 925; The Asbury Park (D. C.) 144 Fed. 553; Ross v. Central R. R. of New Jersey (D. C.) 146 Fed. 608. In the last case named the scows were damaged by the swells of the Asbury Park, and the court, finding that the scows were properly attached in the tow and properly and carefully managed, and there being no evidence to show that the persons in charge of the Asbury Park observed the scows or paid any attention to them, or slowed down, but passed at her usual and regular rate of speed, held the Asbury Park liable for creating the swells which proved dangerous on this particular occasion; it being shown that, if the speed of the boat were reduced, the swells would be reduced accordingly. The principle followed in all of these cases relating to the Asbury Park was established by the Circuit Court of Appeals in the case of The Majestic, 48 Fed. 730, 1 C. C. A. 78, in which the court held that, if the swells of the Majestic produced harmful results, then it was necessary for her officers to be watchful of craft, and to regulate the motions of the Majestic

accordingly. The court said, further, that small craft had a right to navigate without anticipation of "any abnormal dangerous condition, produced solely by the wish of the owners of exceptionally large craft to run them at such a rate of speed as will insure the quickest passage"; and the Majestic was held liable for injuries, although "navigating in the way and at the speed customarily adopted by vessels of her class," inasmuch as the towboats were held not to have been in fault.

Another class of cases has relation to injuries occurring to vessels lying at wharves at the side of narrow channels up and down which the vessel causing the injury is passing. The Rhode Island (D. C.) 24 Fed. 295; The Tiger Lily (D. C.) 11 Fed. 744; The New Hampshire (D. C.) 88 Fed. 306. In such cases the courts have held the doctrine set forth in the case of The New Hampshire, supra, that:

"The size of each steamer's waves when they reach the slips depends upon her model, the speed of her propeller, and her distance from the docks; and every steamer must take the risk of regulating her speed and distance accordingly."

The C. H. Northam, Fed. Cases Nos. 2,689, 2,690 (the reports being those of the original trial and of the hearing upon the appeal), contains the following statement:

"Her right to pass the tow where she did was dependent upon her ability to pass without causing injury. If she could not pass in that place without causing injury by her swell, she was bound to wait until beyond the narrow place, and the attempt to pass when she did was negligence. If, on the other hand, by going slower than she did, she could pass where she did without causing a dangerous swell, then it was negligence to maintain the speed she did in passing."

The Northam was a Sound steamer, passing up New York Harbor on the way to the port of New Haven at the time the accident happened.

In the case of The Columbia, 61 Fed. 220, 9 C. C. A. 455, the steamer, passing up the Delaware river near Philadelphia, met three barges and a lighter upon a trip which the Columbia had been in the habit of making daily, and had frequently met similar tows in the same neighborhood. The court says that those in charge of the tows were justified in assuming that the Columbia would slow down, or that precautions would be taken in time to avoid endangering their safety, and that the Columbia would proceed as she had ordinarily done in such a manner as to avoid injury to the tow. In another case relating to the same steamer (The Columbia [D. C.] 55 Fed. 767), the boat was held liable for injuries done to loaded barges, upon testimony showing that there was unusual motion in the water caused by the Columbia, which it was testified had slowed down before meeting the barges; but that the barge was under no obligation to anticipate that the Columbia would not slow sufficiently, as she had done upon previous occasions, and that the consequences could not be realized until too late for the barge to avoid the accident. The case of The Monmouth (D. C.) 44 Fed. 809, held the Monmouth responsible for damages, in the following language:

"The weight of testimony and of probability, upon all the evidence, is that the steamer, through some preoccupation of her men, or false estimate of

distance, went nearer than usual to the tow, and nearer than was safe at full speed, and that the accident arose from the failure to use the customary and requisite caution when going so near."

The general principle deducible from these cases would seem to be that stated in the case of The Batavia, 9 Moore, P. C. 286, in which it was stated, that, if the steamer "was going at such a rate as made it dangerous to any craft which she ought to have seen, she had no right to go at that rate. At all events, she was bound to stop, if it was necessary to do so, in order to prevent damage being done by the swell to the craft that were in the river."

The rule is also stated in the case of The Morrisania, 13 Blatchf. 512, Fed. Cas. No. 9,838, where Judge Hunt, the same judge who decided the case of The Daniel Drew, supra, said that the "undoubted right to the navigation of the river is subject to the restriction that it must be exercised in a reasonable and careful manner, and do no injury to others that care and prudence may avoid."

In so far as deductions of principle can be made from the various statutes and cases, as illustrated by the above citations, it would seem: (1) That the boat causing the injury must be held responsible for any failure to appreciate the reasonable effect of its own speed and motion through the water at the particular place and under the particular circumstances where the accident occurred. (2) That boats in the neighborhood, which may be reasonably expected to be affected by the swells of the steamer causing the injury, are to be taken into consideration, and that the officers of the steamer must use reasonable judgment and care, not only to see whether such an accident is likely to happen, but whether they have taken all reasonable precautions to avoid such an accident, even when the result of former experience has shown that, in the ordinary and usual course of events, the boat passed is likely to escape injury. (3) That the tug or smaller craft, if properly managed, with the tow properly arranged, has a right to assume that large craft will observe such precautions as are reasonable to avoid inflicting injury, and that these precautions will not be merely such as would be sufficient to produce ordinary and customary circumstances of passing. (4) That the tug or smaller craft, relying on the presumption that the larger craft will take precautions, is under no obligation to warn the larger craft, if the tug or smaller craft is in a proper place and navigated properly according to general rules.

From this view of the authorities let us look at the case at bar. The testimony shows that the Chapin is a large steamer, propelled by a screw, and creating a considerable swell. She passes up the East river and through the Sound on practically daily trips during the summer season, and is accustomed to frequently meet tows and scows. Her captain and mate must be held to be acquainted with the amount of disturbance which she creates moving through the water at her various rates of speed, and to be sufficiently informed upon all matters connected therewith to estimate the effect of the passage of the steamer at any particular time upon boats either being overhauled or met with in the narrow channels of the East river and Long Island Sound. The fact that this accident happened under the conditions above stated of itself shows that the Chapin was proceeding at such a rate of speed, and

causing such swells, as to make it dangerous for scows laden in the customary manner, at least if the Chapin passed within a distance of from 75 to 100 feet of the scows. These facts were matters which the captain or pilot of the Chapin could take into account in estimating the speed and nearness with which the Chapin could pass a scow or a tow of scows, approaching in daylight, with nothing to prevent the Chapin from choosing her position and rate of speed. It would appear that the Chapin had slowed down and was proceeding at a somewhat slower rate of speed, so far as her engines were concerned; but there is nothing to rebut the testimony that the effect of the Chapin passing through the water was to cause swells, which were the only proximate cause of the injuries sustained. The Chapin may have passed tows exactly similar to this numerous times, and the tows invariably have passed through the swells safely, but that fact would not relieve the officers of the Chapin from considering, upon this particular occasion, the amount of disturbance which was then being caused, and the effect which that disturbance would have upon the scows which the Chapin was about to meet. The tow was in plain sight for a sufficient distance for the officers of the Chapin to have formed an opinion and to have exercised judgment in directing the movements of their boat. It is considered that the officers in charge of the Chapin either relied upon their past experience, and therefore made no attempt to estimate the necessities of the particular situation, or that from familiarity, or because of freedom from previous accidents, these officers misjudged the effect of the swells from their own boat.

On either theory the Chapin must be held responsible, and the libelant may have a decree.