## THE HENDRICK HUDSON.

### (District Court, S. D. New York. April 29, 1908.)

1. SHIPPING—LIABILITY OF VESSEL CAUSING DANGEROUS SWELLS—INJURY TO VESSELS AT PIER.

Vessels using a dock cannot be expected to so manage their work as to receive extraordinary swells without harm, and a. vessel making such swells, although navigated in the usual manner, is responsible for their effects upon innocent vessels.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 345.

Liability of vessel for injuries caused by creation of swell, see note to The Asbury Park, 78 C. C. A. 3.]

2. SAME.

A steamship passing up the Hudson river at her usual speed of 16 miles an hour, and creating such swells on passing a pier that men unloading scows thereat were obliged to stop work for fear of being knocked overboard, *held* liable for injury caused thereby to one scow lying nearest to the shore, with little water under her and partly loaded with stone, by being pounded on the bottom with such force as to start her seams.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 345.]

In Admiralty.

Foley & Martin, for libellant.

Olcott, Gruber, Bonynge & McManus and Harrington Putnam, for claimant.

ADAMS, District Judge. Edward Reilly, the owner of the scow Prosperity, brought this action to recover the damages alleged to have been caused by the swells of the steamboat Hendrick Hudson, while passing the scow, then discharging a portion of her load of stone, at the foot of 158th street, North River, on the 12th day of August, 1907. It was alleged by the libellant that the scow was in all respects strong and seaworthy, was properly moored, and that the steamer when going up the river at an excessive and dangerous rate of speed, caused great suction and extraordinary swells which lifted the scow and caused her to strike violently against the bottom of the river and the dock where she lay, whereby the seams of the scow were opened and she was otherwise seriously damaged. Faults were alleged: (1) in proceeding at a high and dangerous rate of speed,

(2) in passing too close to the Prosperity, (3) in not stopping or slowing down when passing craft moored along the shore, (4) in failing to appreciate the reasonable effect of her speed and motion through the water at the place and (5) in failing to take reasonable precautions to avoid such an occurrence as described.

The answer of the steamer required proof as to the ownership of the scow, denied that she was staunch and seaworthy and alleged on the contrary that she was old, rotten, leaky and unseaworthy, required proof of her location, denied that she was properly moored, denied that the steamer passed the location described at an excessive and dangerous rate of speed, denied that she caused extraordinary swells or that any from the steamer caused the scow to strike violently against the bottom or the dock where she lay, whereby her seams were opened, or that she was thereby damaged; the answer alleged that the scow, in addition to being rotten and unseaworthy, was negligently and improperly fastened and that the place where she lay was not a proper or safe place for the scow to be moored or fastened; it was further alleged that the steamer passed the place at a reasonable speed and in a careful and proper manner and in such a way as to do no damage to boats which she passed, or which were properly moored or fastened at the docks, and that the scow was damaged through negligence on the libellant's part.

The testimony shows that the boat was about 10 years of age and in good condition. Her usual spring overhauling had been somewhat delayed and nothing had been done in the way of caulking and overhauling since November, 1906; but before she encountered the swells, which are the subject of this action, she leaked so little that it was unnecessary to pump her daily. By a survey, held on the 20th of August, following the accident, it was found that the oakum had worked out of the sides, ends and bottom and the scow was leaking badly.

The Prosperity was a rectangular wooden scow with a level deck and vertical sides with inclined overhanging ends, rising on a sloping angle from a flat bottom. She was about 100 feet long, 31 feet beam, with 10 feet depth of hold. Her whole load was carried on deck and kept in place by bulkheads at each end, forming a cargo box about 75 feet long and 29 feet inside width. Her ordinary load was from 470 to 500 yards, weighing about 500 gross tons. On this occasion she was loaded with a cargo of about 380 yards of broken stone of which 100 yards were to be delivered at 158th street. When she reached there, she was at first placed on the outside of a sand scow lying fastened to the south side of the wharf and remained there for several days, probably the 8th, 9th and 10th of August. On the 11th, she was moved around to the north side, where she lay through the night outside of another barge, and she obtained a discharging berth the next morning by lying in a diagonal position, her bow in toward the shore and the stern outside of another barge. The tidal current commenced to run flood about 5 o'clock. She was thus made fast and commenced discharging, and was only partially finished when the accident happened. There were 5 other vessels fastened to the pier at the time.

The wharf was a solid structure toward the shore but supported by piles on the outer end for about half its length. There was no bulkhead. The river bottom gradually shelved as it neared the shore and there was very little water over the bottom there at low tide. At the time of this accident it appears by the records of the city dock department, and this pier belonged to the city, that immediately next to the pier there were depths varying from 1 foot at the top of the mud, which covered the bottom, nearly inshore, to 31 feet at the end of the wharf. Such depth increased outward from the shore, slightly at the inner part, but quite noticeably, to 43 feet, at a point opposite the end of the wharf. The first berth, the outside one, covered a space of about 100 feet and at the inner end, there was a depth of 15 feet next to the wharf and 16 feet about 25 feet out therefrom. It was in this instance occupied by the barge Bourne No. 3. The next berth, partly occupied by the Prosperity, was largely over ground, which was intended to be dredged out for the purpose of making another berth but at the time was in the original condition. It commenced with the said respective depths of 15 and 16 feet and ran at the inner end, 100 feet nearer the shore line to 2 and 3 feet. The rise and fall of the tide was about 4½ feet, so that at high tide, 11 o'clock, there would be over the respective points of the inner berth at the outer end 6½ and 7½ feet, according to the depths given. The master of the Prosperity said, however, that when he went to the berth, his boat was drawing 9 feet amidships. He could not give the depths elsewhere but said that probably she drew 7½ feet at the bow, the inner end; that he went into the berth, about 7:15 o'clock and shortly afterward by sounding with a pole he found 8 or 9 feet under his bow, distant about 40 feet from a place farther in toward shore where he found 4 feet; that he had plenty of water when he went there. Under this very conflicting testimony, it is impossible to reach any definite conclusion as to the depth of water in which the boat was lying. That she was there in the position described, however, is shown by the statements of other witnesses, particularly from the Bourne No. 3, but it does not appear from any testimony except her own master's that she pounded on the bottom. There was apparently enough water to float her when she was pulled into the position in which she lay, and the depths given by the city engineer's diagram must be disregarded. The account of the depths of water where she lay given by the master of the vessel is not entirely consistent or satisfactory but when it is considered that she was seen by other witnesses to be seriously affected by the swells of the Hudson, I think that must be deemed conclusive. The Prosperity was the only one of the several boats lying at the pier which claimed to have received injury at the time but that is explained by her location at a place where she was subjected to being raised by the swells, and when the water, or some portion of it, being taken from under her by the suction. It was said by the libellant's witnesses that the swells were 6 to 8 feet high, but that cannot be credited as such waves would have gone over the wharf and there is no evidence to show that such a state of affairs existed. The height of the waves was doubtless considerably less than the estimate but the evidence is sufficient to establish that dangerous ones

were created and that the barge suffered from them by being pounded on the bottom, surged back and forth, with some slight damage from contact with the pier, and her lines stretched, notwithstanding any obstruction which might have been offered by the wharf or the outside boat.

The testimony of Mr. Kirby was particularly relied upon by the claimant, who said he observed that the swells of the Hudson scarcely moved boats lying at the pier. This witness was a very competent naval architect, who designed the Hudson for speed and with a view of creating the least swells possible and doubtless was successful in a degree in the latter respect. He certainly was as to speed, because it appeared that the Hudson ordinarily made at least 16 miles an hour, as she was doing in this instance, notwithstanding stoppages at various landings on the river. He was called as a witness after having made certain observations on the 17th of October, 1907, when he measured the height of the swells the steamer made at the pier and he said that they were "exactly eight inches." They were much higher than that in this case, sufficiently so to be dangerous to a vessel lying as the Prosperity was, with not very much water under her. Mr. Kirby also said that the people working on (at) the pier paid no attention to the waves made the day he took his observations. The testimony of the men working on the Bourne No. 3 was that when the swells from the Hudson came in on the 12th of August, they were obliged to stop working for fear they would be knocked overboard, a very different state of affairs from that which existed when Mr. Kirby ascertained his facts.

It is urged that the Hudson was operated in a reasonable everyday manner, the same as in the last two seasons of 1906 and 1907, upon the same time schedule as had been long used by the steamers of the line and no accident followed, and liability should not result from the accident in this case as the Prosperity was placed in a precarious position and she was the only vessel at the wharf claiming to have received any injury from the swells on this occasion. It does not appear, however, that such operation was not attended by the creation of dangerous swells but rather the contrary. It is true that the Prosperity's position was somewhat different from that of the other boats at the pier but it was necessarily so taking the facilities for discharging there into consideration. It can not be expected that vessels will so manage their work, as to receive extraordinary swells without harm. The vessel making such swells is responsible for their effects upon innocent vessels.

The case of The Daniel Drew, 13 Blatchf. 523, Fed. Cas. No. 3,565, cited by the claimant, can not now be regarded as an authority for a different rule. The more recent authorities (The Drew [D. C.] 22 Fed. 852; The Majestic, 48 Fed. 730, 1 C. C. A. 78; The Asbury Park [D. C.] 138 Fed. 617, affirmed 142 Fed. 1037, 71 C. C. A. 684; Id. [D. C.] 138 Fed. 925; Id. [D. C.] 144 Fed. 553; The Hendrick Hudson [decided February 28, 1908] 159 Fed. 581) impose a greater degree of care upon vessels which cause swells than was required in the Drew Case.

Decree for the libellant, with an order of reference.