**The BANK LINE Limited, as owner of THE S/S ETIVEBANK, Libelant-Appellant,**

**v.**

**The TEXAS COMPANY (Panama) Inc. and THE S/S TEXAS, her engines, boilers, etc., Claimant-Respondent-Appellee.**

**No. 84, Docket 24566.**

United States Court of Appeals
Second Circuit.

Argued Nov. 19, 1957.

Decided Jan. 8, 1958.

Richard G. Ashworth, New York City (Haight, Gardner, Poor & Havens, and MacDonald Deming, New York City, on the brief), for appellant.

Edward C. Kalaidjian, New York City (Thacher, Proffitt, Prizer, Crawley & Wood and Robert S. Stitt, New York City, on the brief), for appellee.

Before HAND, HINCKS and LUMBARD, Circuit Judges.

HINCKS, Circuit Judge.

This is an appeal from a final decree in admiralty which dismissed a libel after trial to the court in October, 1956.

---

The incident giving rise to this litigation occurred on February 23, 1951 in the Suez Canal. It is Canal practice that ships wishing to enter the Canal from either end shall form in convoys and begin their trips at scheduled times. Since the bypasses presently in use had not in 1951 come into operation, when two convoys coming in opposite directions were to pass each other the ships of the southbound convoy pulled over and moored on the western bank of the Canal. When the northbound convoy, which often included loaded oil carriers, had passed, the southbound convoy re-formed and proceeded.

The displacement of water caused by a passing ship in the shallow and narrow canal generally causes a stationary southbound ship to surge forward with its bow swinging outward toward the center of the channel. This forward surge when it subsides, leaving the ship at an angle to the African bank, is followed by a sternward surge generally terminating with an outward movement of the stern toward the center of the channel. These normal forces are expected and prudent navigation requires that the moored vessel shall take protective counteracting steps. This is normally done by slacking the mooring lines to allow the vessel to move forward, and then, as the forward surge abates, by using a forward force on the engines frequently accompanied with a left rudder to counteract the expected sternward surge which otherwise might force the vessel's stern into the center of the channel. Because of the action of these forces on the moored ships, prudent navigation requires that a northbound ship in effecting a passing shall proceed at the slowest speed which will enable it to maintain steerageway.

On the day in question, libelant's ship, the Etivebank, was the fourth ship in the southbound convoy of five ships. The respondent's supertanker Texas was the eighth ship in the northbound convoy of nine ships. When the Texas passed the Etivebank, the forward and backward surges occurred but the Etive-bank's stern struck the bank, causing the damages complained of, although its pilot had properly used its engine and, in an unsuccessful effort to avoid the bank, had before striking given a right rudder.

The trial judge found that the minimum speed at which the Texas might maintain steerageway was "less than four knots." He also found that the Texas did in fact pass the Etivebank at that minimum speed and that the Texas had observed all of the rules of "prudent navigation" during the passing. He further found that the passing occurred "between 6:48 and 6:50 a. m." on the morning of February 23, 1951.

On this appeal, libelant presses two contentions: first, that the court's finding that the Texas did in fact pass the Etivebank at a speed of less than four knots is clearly erroneous; and secondly, that the Texas, even if it did pass at such speed, was at fault in failing to tie up while the southbound convoy passed, since its movement even at its minimum speed was bound to cause damage to smaller ships.

■■ Libelant's attempt to prove erroneous the court's finding that the Texas passed at "less than four knots" is grounded on a series of mathematical computations. In order to properly understand this argument, the following facts must be set forth. The bellbook of the Texas indicates that at 6:42 a. m. the speed of dead slow ahead was ordered; at 6:51 a. m. slow was ordered; and at 6:52 a. m. half ahead was ordered. On this appeal, libelant does not contest the finding below that the speed of dead slow ahead was the minimum safe speed for the Texas. Since the trial court found that the passing occurred between 6:48 and 6:50 a. m., during which time the Texas was proceeding at its minimum speed, the libelant must prove that the passing could not have occurred until after 6:50 a. m., by which time, according to its own bellbook, the Texas was no longer at minimum speed. The Etive-bank was moored at a point approximately 44.2 kilometers south of the northern entrance to the Suez Canal.

This was one kilometer north of the Suez Canal Company checkpoint at Kantara, which was at exactly 45.2 kilometers. There is testimony in the record that Suez Canal pilots are very careful when approaching Kantara because, if speed is not reduced, Company ferries may be damaged and the offending pilot will be disciplined. The captain of the Texas testified that the speed of dead slow ahead, which was ordered at 6:42 a. m., was ordered before the Texas actually reached Kantara. From this the libelant argues that the Texas could not have passed Kantara until at least 6:43 or 6:44 a. m., and, indeed, an official graph prepared by the Suez Canal Company indicates that the Texas did pass that checkpoint in that interval or within a minute thereof. Since it was one kilometer from Kantara to the Etivebank, libelant asserts that if the Texas were going at its proper speed of "less than four knots" over the ground, the Texas could not possibly have passed the Etivebank until after 6:51. For example, if the Texas were moving at a speed of 3.9 knots over the ground it would have taken 8 minutes and approximately 18 seconds to reach the Etivebank. Therefore, even if the Texas passed Kantara at 6:43 (the earliest time of which there was testimony) it would not have reached the Etivebank until 18 seconds after 6:51, at which time, libelant argues, the Texas' own books show it to be moving at slow speed and not at the required speed of dead slow. (At 3.95 knots the elapsed time would be 8 minutes and 12 seconds.) The validity of the foregoing computations is the crucial issue in this case. For if they do not prove that Judge Cashin's finding is clearly wrong we may not reverse that finding: it is supported by substantial evidence.

We turn, therefore, to an analysis of the computations and the evidence relevant thereto. The Suez Canal pilot on board the Texas at the time of the passing testified in answer to an interrogatory that the Texas passed each ship in the southbound convoy at the lowest rate of speed suitable for the passing of the ship. There was also a revolution counter on the Texas' bridge by which the pilot could keep informed as to the setting of the engine. In response to a question seeking the Texas' actual speed over the ground at the time it passed the Etivebank, the pilot replied: "I do not remember and I believe the speed was between 3 and 4 knots per hour." The pilot aboard the Etivebank, in answer to an interrogatory, said that the passing ships were "moving slow." The master of the Texas did not directly remember the speed of passing but, testifying from his records, estimated that his passing speed over the ground was "a little less than 4 knots." The captain of the Etivebank was the only person to testify from direct recollection. He testified that the Texas passed "at a minimum of four knots." Judge Cashin evidently did not believe this witness whose observations were made from the starboard side through the windows of the wheelhouse.

There was one other piece of evidence supporting respondent's case which requires mention. That was a mathematical computation made on the witness stand by a Suez Canal pilot named Ivancich who was not an eyewitness to the passing. Using a speed of dead slow and a distance of 900 meters from Kantara to the Etivebank, he testified that the Texas would have passed at between 6:49½ and 6:50½. Libelant contends that it was this computation upon which Judge Cashin relied and that the distance was wrong. But there is nothing which indicates that this computation was the sole source of Judge Cashin's finding. In fact, in the light of the evidence above, and his evaluation of the witnesses before him, we find substantial evidence supporting his finding of passage at minimum speed even without consideration of Ivancich's estimate—which apparently is incorrect. However, as we shall now show, the libelant's own mathematics are not conclusive of this case.

We have no way of knowing precisely the Texas' actual speed over the ground during the critical period. But as we

have seen, assuming that the Texas passed Kantara at 6:43,* if it were moving at a speed of 3.9 knots the passing would not have occurred until 18 seconds after 6:51. It is on the basis of these 18 seconds, or some such brief period, that the libelant predicates clear error in Judge Cashin's finding.

But there are several factors, some of which might seriously affect libelant's computations, for which libelant has not accounted. First, there is testimony to the effect that a reduction in speed did not become effective until the Texas had proceeded two ship's lengths. The Texas was 625 feet long, or approximately 192 meters. Two ship's lengths (384 meters) is a far from negligible distance in the context of the problem in this case which relates to the time consumed in traveling only one kilometer. Presumably there also would be a corresponding time lag in the increase in speed which the Texas initiated at 6:51. Also, there was no evidence as to what part of the Etivebank, if any, was moored precisely at the 44.2 kilometer mark. Since the Etivebank was 448 feet long (138 meters), it obviously makes a substantial difference what part of the ship was opposite the landmark. Nor have we any indication as to how far "past" the Etivebank the Texas had to be before it could increase its speed without additional hazard to the Etivebank. Moreover, it is significant that all of the entries in the bellbook of the Texas are entered in even minutes with no showing of seconds. A record thus expressed in terms of the even minute scarcely negates the possibility that the notation of slow speed ahead at 6:51 might have been ordered at 6:51¼ or perhaps at 6:51¾. In fact, at 6:18 a. m. the Texas executed three speed changes within one minute, yet all three follow the 6:18 entry with no seconds shown.

With so many unexplained factors entering into the libelant's computation which affect the result we find it impos-sible, on the basis of the mathematics presented, to hold Judge Cashin's findings to be clearly erroneous. At most, some doubt has been cast upon the finding of a passing between 6:48 and 6:50. But such a doubt is not crucial, especially when one considers that consistent with credible evidence the Texas may have ordered an increase in speed at, say, 6:-51¾, which was not translated into the appropriate engine setting until after a short time lag and which thereafter was fully accomplished only after a ship's length or more had passed.

An alternative approach pressed by the libelant follows via the logbook of the Etivebank which indicates that the Texas passed at 6:53 a. m. But this was *Etivebank* time and the captain of the Etivebank testified that his clocks were not synchronized upon entering the Canal. It is true that from charts and graphs it appears that Suez Canal Company time, the Texas time and the Etivebank time were, in fact, all within a minute of each other. However, in the setting of this case that minute might have been crucial. And the accuracy of the Etivebank's log was not free from all question. For the Suez Canal Company graph indicates that the dredge Paul Solente, which was just behind the Texas in the northbound convoy, passed Kantara 16 or 17 minutes after the Texas (*at 7:00 a. m.*). Yet the Etivebank, which was only one kilometer north of Kantara, records in its log that the two ships passed within 5 minutes of each other— the Solente being logged past at *6:58 a. m.!* The resulting doubt as to the accuracy of the Etivebank's records is such that we may not say that Judge Cashin erred in not relying on them.

In the light of the record, Judge Cashin's findings must stand.

■ We come now to libelant's second contention: that the Texas was at fault for its failure to tie up and wait until the Etivebank had passed. This argu-

---

* There was evidence that the Texas passed Kantara at between 6:43 and 6:-44. To demonstrate clear error in the findings, the libelant's computations must rest on those data that are the most favorable to the respondent.

ment is grounded on the proposition that even if the Texas was, in fact, passing at its minimum speed its conduct in so doing was negligent because its size was such that it could not pass without causing damage to smaller moored vessels.

We find insufficient evidence to support—still less, to require—a finding of fault in this respect. There were no rules of the Canal or customs in force at the time which required ships in a northbound convoy to stop and moor while southbound ships passed. Nor was there evidence that vessels of the Texas' size when passing at their minimum speed frequently caused damage to smaller ships. Northbound tankers were generally heavily laden. For them to lose steerageway, stop and moor, would obviously increase the danger of damage from sheering and slow up traffic in the Canal. Also, as we have seen, even smaller ships cannot effect safe passings without cooperation and highly skillful navigation on the part of the moored ships. And, obviously, it would be difficult for a laden ship of the Texas' size, if moored, successfully to accomplish the required maneuvers.

Libelant cites The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148; The Southern Cross, D.C.E.D.N.Y., 21 F. 2d 75, affirmed 2 Cir., 21 F.2d 76; The Hendrick Hudson, D.C.S.D.N.Y., 163 F. 862, affirmed 2 Cir., 168 F. 1021; and The Majestic, 2 Cir., 48 F. 730. But these cases all involve the passage of vessels at a negligently fast speed. That has not been shown here. The New York, D.C.S.D.N.Y., 34 F. 755, also cited by the libelant, is distinguishable. For there the passing occurred in wider waters and the moored vessel had no responsibilities during the passing. And there the passing ship was negligent in that either by a slight delay it could have passed at a greater distance from the moored vessel and in that the situation there existing was such that without losing its steerageway it could have stopped its wheel entirely for one or two lengths while passing.

We hold that the respondent was not liable for its failure to stop, moor and wait.

Affirmed.